Ex parte MARSH et al.

(Circuit Court, E. D. Virginia.   September 18, 1893.)

1. TREATIES—COMPACT OF MARCH 28, 1785, BETWEEN MARYLAND AND VIRGINIA
   —CONSTRUCTION—FISHERIES IN POCOMOKE RIVER.
   Section 7 of the compact between Maryland and Virginia, entered into
   March 28, 1785, provided that "the citizens of each state, respectively,
   shall have full property in the shores of the Potomac river adjoining their
   lands, with all advantages thereunto belonging, and the privilege of carry-
   ing out wharves and other improvements so as not to obstruct or injure
   the navigation of the river; but the right of fishing in the river shall be
   common to the citizens of both states; provided that such common right
   be not exercised by the citizens of one state to the disturbance of the
   fisheries on the shores of the other state; and that the citizens of neither
   state shall have a right to fish with nets on the shores of the other;"
   and section 8 of the compact provides that "all laws which may be neces-
   sary for the preservation of fish, or for the performance of quarantine
   in the river Potomac or for preserving and keeping open the channel
   and navigation thereof, or of the river Pocomoke, within the limits of Vir-
   ginia, by preventing the throwing out of ballast, or giving any other ob-
   struction thereto, shall be made with the mutual consent and approbation
   of both states." *Held*, that neither directly, nor by implication or construc-
   tion, did sections 7 and 8 grant a common right of fishery, including the
   catching and taking of oysters, in Pocomoke river, to the citizens of Mary-
   land, or a right to joint legislation for the protection of fish in such
   river to the state of Maryland.   Hendricks v. Com., 75 Va. 934, disap-
   proved.

2. SAME—FISHERIES IN POCOMOKE SOUND.
   Even if a common right of fisheries in Pocomoke river had been granted
   by the compact, such right would not have extended to Pocomoke sound,
   as a part of such river, since the river and sound have always been con-
   sidered distinct bodies of water, and are so designated in the report of
   Commissioners Scarborough and Calvert, made in 1668; in the map of
   Augustin Herrman, published in 1673; in the first and all subsequent
   editions of the United States Coast Survey; and in the Black-Jenkins
   award of January 16, 1877, which established the boundary line between
   Maryland and Virginia, and was accepted by the two states, and ratified
   by Act March 3, 1879, (20 Stat. 481.)

3. SAME—DOUBTFUL BOUNDARY—EFFECT OF SUBSEQUENT ESTABLISHMENT.
   Section 10 of the compact of 1785, which stipulates that offenses com-
   mitted by citizens of Maryland within the limits of Virginia, on that part
   of Chesapeake bay where the line of division between Smith's point and
   Watkins' point may be doubtful, shall be tried in a court of Maryland,
   lost its force and effect by the Black-Jenkins award, which established
   with precision and certainty the line of division between such points, so
   that a Virginia court is now competent to try such offenses.

At Law.   W. W. Marsh, R. L. Wharton, and Severn Nelson,
brought into court on writs of habeas corpus, apply for discharges
from custody, in which they were held for having violated the oys-
ter laws of Virginia.   Writs dismissed.

John P. Poe, Atty. Gen. of Maryland, Bradley T. Johnson, and
Thomas S. Hodson, for petitioners.

R. Taylor Scott, Atty. Gen. of Virginia, (John W. Gillett, on the
brief,) for Virginia.

Before GOFF, Circuit Judge, and HUGHES, District Judge.

HUGHES, District Judge.' Three citizens of Maryland—William W. Marsh, Robert L. Wharton, and Severn Nelson—are before the court on writs of habeas corpus issued upon petitioners' severally alleging that they have been unlawfully prosecuted for violating certain laws of Virginia relating to oysters, and have been unlawfully convicted and imprisoned by the county court of Accomack county, Va., for the offenses charged. Marsh was convicted of violating section 2156 of the Code of Virginia, which forbids all persons from taking or catching oysters with a dredge, scraper, or any other instrument than ordinary oyster tongs, in any of the waters of the commonwealth, except as prescribed by other sections of the Code. Wharton and Nelson were convicted under section 2147 of the Virginia Code, which forbids any person other than a resident of Virginia, who has paid a tax and obtained a license as prescribed by law, from taking or catching oysters in any manner in the waters of the state. The indictments in the cases of Wharton and Nelson charge that the offenses were committed on Ledge rock, in that part of Pocomoke sound which lies within the limits of Virginia. The indictment in the case of Marsh charges that the offense was committed on Hurley's rock, in Tangier sound, within the limits of Virginia. It is conceded that all of the offenses were committed within the limits of Virginia; but it is contended in defense that, by reason of Wharton's and Nelson's offenses having been committed in Pocomoke sound by citizens of Maryland, the courts of Virginia cannot take cognizance of them, and that by reason of Marsh's offense having been committed at a place near the boundary line between Virginia and Maryland, running from Smith's to Watkins' point, where the line is "doubtful," the Virginia courts have no jurisdiction to try him as a citizen of Maryland. We shall deal, in treating the question raised, more directly with the cases of Wharton and Nelson, and afterwards with that of Marsh.

A great mass of documentary evidence and historical literature has been filed by counsel on both sides as evidence in these causes. We have studied it with great care, and as thoroughly as the importance of the question involved seemed to require. The extraordinary volume and diffusiveness of this evidence renders necessary a more elaborate discussion and decision than is usually submitted from the bench in ordinary litigation. We will first describe in some detail, as matters of common knowledge, the oyster properties of Pocomoke sound, and the laws of Virginia enacted for the protection generally of her oyster interests.

Pocomoke sound has an area of about 90 square miles, and is one of the largest subdivisions of Chesapeake bay. According to the survey recently made by Capt. Baylor under an act of the legislature of Virginia, 52 square miles (28,528 acres) of this area are natural oyster rocks, beds, or shoals. It is common knowledge that the natural growth of oysters in this sound at one time was nearly depleted by constant and imprudent dredging; but some 10

or 12 years ago the legislature of Virginia prohibited dredging, and since then the oysters on the natural rocks have recuperated, and now the sound is well stocked. Immense quantities are removed annually; but so long as the removals are made with tongs, only, the quantity continues to be abundant; and a rock, if worked and nearly depleted, will, when left alone, reseed itself with a growth of small oysters, which in two or three years become marketable. It is doubtful if so rich a deposit of oysters, in as small a territory, can be found in the waters of Virginia or Maryland. That portion of Tangier sound which is within the limits of Virginia is a much larger body of water than Pocomoke sound; and, although it is looked upon as rich in its production of oysters, yet it has but 4,746 acres (seven square miles) of natural beds, rocks, or shoals. Pocomoke river is a navigable stream midway on the Eastern Shore peninsula, lying wholly within the state of Maryland in its entire course southward, until it crosses the boundary line five miles above its mouth, and until 1877 lying wholly within Virginia for that five miles, from the boundary line to its mouth, where it empties into the sound.

It is shown by public documents that Pocomoke sound supplies the main—almost entire—support to at least 3,000 of the inhabitants of Accomack county, Va., counting only those engaged in the oyster industry, and the members of their immediate families. Of that part of the population dependent upon their labor in this sound for the maintenance of themselves and families, five-sixths rely upon taking oysters directly from the places of their natural growth, and selling the catch. The remaining sixth plant alone, or combine planting with tonging. The planters have their grounds, upon application, assigned to them, and marked by stakes, by the oyster inspector of the district, who is an officer of the state of Virginia. Then they are surveyed by the county surveyor, and the survey returned to and recorded in the county court clerk's office. This, if exceptions are not filed and sustained, authorizes the planters to hold their assignments so long as they pay the annual rent to the state. The planter prepares his ground by depositing shells upon it, and placing a limited quantity of oysters thereon, to facilitate its seeding. If no oysters are placed upon the bed, still the spawn will attach itself to the shells, and produce a growth; but this process is hastened by placing seed oysters upon the prepared bed, as before stated. In a few years the oysters grow so large and thickly that it becomes difficult to distinguish the artificial beds from the natural rocks. At maturity (in about three years, if the location is suitable) the oysters are removed from the beds, and marketed; the quality being superior to, and the oysters commanding a better price than, those taken from the natural rocks.

Official records show that 139 assignments and surveys have been made in Pocomoke sound upon applications of planters, and these surveys embrace a little more than 1,000 acres. The rec-

ords show that the surveys run from one-eighth of an acre to 105 acres,—most of them containing less than 10 acres. Some few persons, but very few, occupy lands for planting purposes which have not been assigned or surveyed, and consequently they have never acquired a legal right to hold them. .

The laws of Virginia regulating the oyster culture are found in the Code and statutes. The owner of a boat to be used in t king or catching oysters from the natural rocks is required to have the boat registered by the oyster inspector of his district every year, and pays the inspector for his services a fee of 50 cents, annu l'y. Each registered tongman is required to report weekly the amount of his sales of oysters, and to pay thereon an amount equal to the amount of tax levied by the state on any other species of property; but, at the time of registering, any tongman can commute the tax on his sales by paying two dollars for the entire season. This the tongers invariably do, because it relieves them from the trouble of making weekly reports, and the amount of commutation is less than the tax on sales would amount to. The planter pays an annual rent of one dollar per acre for the land assigned to him, and he also reports to the commissioner of the revenue, where he lists his property for taxation, the amount of his sales of planted oysters for the preceding year, upon which sales is assessed a tax, the same as upon other taxable property. These are the only taxes collected from tongers or planters.

Two truths are obvious from the foregoing recital: First, that unless laws are passed, and stringently enforced, for the protection of the oyster rocks, beds, and plants in Pocomoke sound, the oysters which are produced in profusion there will soon be destroyed; and, second, that in order preserve and cultivate the oyster, and increase its production in those waters, it is necessary to allow private proprietorship in the oyster plants, subject, at the p'easure of Virginia, to such taxation as entails upon the state the duty of protecting these taxed oyster properties by police and penal laws. These truths very broadly distinguish the oystering industry from that of catching running fish in the waters of the Chesapeake and its tributaries, in which there can be no private property until they are caught, and invalidate any claim that may be made, by inference, to the right of oystering, from grants, in general terms, of the right of fishing. We think, moreover, it may be laid down as a proposition of natural law that, inasmuch as oysters are becoming more and more valuable and necessary every year, with the growth of populations, as human food, any state possessing great and productive oyster deposits owes it as a duty to humanity, no less than to her own citizens engaged in the oyster culture, to protect these deposits from such depredations as destroy their valuable product. In order to give effectual encouragement to this industry, Virginia has enacted laws, some of which have been described above, which confer private rights in oyster beds, and which impose taxes upon cultivators of oysters; which are expended in

supporting a police force charged with the duty of protecting these private properties from such depredations as those of which the petitioners have been convicted. We do not understand that the validity of these laws of Virginia is questioned by counsel for the petitioners, or that they question the right of private property in oyster beds. The defense set up for the petitioners is technical only, denying the jurisdiction of the Virginia court which convicted them, and basing the denial solely on the circumstance that their offenses were committed in localities in which Virginia is claimed to have relinquished jurisdiction over Maryland citizens by treaty with Maryland.

We turn now to the Potomac river, on the western side of the Chesapeake bay. The tide-water portion of this great stream, for 120 miles from the Great Falls at Georgetown to the Chesapeake bay, constitutes the boundary line for that entire distance between Maryland and Virginia. Its fisheries for herring, mackerel, shad, and other running fish were for a long time highly valuable, and are quite so still. There are oysters in the more brackish waters near its mouth, but the oyster interests of the Potomac have always been very inconsiderable. The relations of the tide-water portions of the Potomac river to the two states made it necessary that there should be some compact as to its use between Maryland and Virginia. Accordingly, on the 28th day of March, 1785, under the auspices of Gen. Washington, and at Mt. Vernon, a compact was entered into, which had the effect of a solemn treaty, between these states. That compact is still in force, except so far as the subsequent ratification by Virginia and Maryland of the constitution of the United States may have modified and changed it.

Another portion of the boundary between the two states has always been a subject of much interest, to wit, that extending from the mouth of the Potomac across the Chesapeake bay and the eastern shore or peninsula to the Atlantic ocean. Until the final settlement, in 1877, of this boundary line, by Arbitrators Black and Jenkins, which was accepted by the two states, and was ratified by congress by the act of March 3, 1879, (see 20 Stat. 481,) this line was the subject of much controversy, more or less acrimonious, between the two states and their respective citizens. One of the original subjects of contention was the exact locality of Watkins' point, which was ambiguously mentioned in Lord Baltimore's charter. This was fixed, however, at a very early date. It was determined by Commissioners Scarborough, of Virginia, and Calvert, of Maryland, in their report of March 28, 1668, defining its position, and that position has never been changed; certainly, not very largely changed. (The act of congress just cited, and the Code of Virginia, page 62, § 13, strangely refer to the Scarborough-Calvert line as marked by them in 1868, which, of course, are misprints.) Watkins' point, thus determined, has remained from 1668 till now a cardinal point in the boundary line of Maryland and Vir-

ginia. In regard to this point, which determined, and continues to determine, so large a. section of the boundary line of the two states, the two commissioners use the following language:

"After a full and perfect view taken of the point of land made by the north side of Pocomoke bay and the south side of Annamessex bay, we have and do conclude the same to be Watkins' point, from which said point, so called, we have run an east line, agreeable with the extremest part of the westermost angle of said Watkins' point, over the Pocomoke river, to the land of Robert Holston's," etc., and "on into a marsh of the seaside."

That is to say, after fixing Watkins' point, they ran a line from that point on Pocomoke bay, to and "over Pocomoke river," eastward to the Atlantic ocean.

Not only is Watkins' point, as fixed, or nearly as fixed, by Scarborough and Calvert, still a cardinal point in the boundary, but the point at which these commissioners crossed over the Pocomoke river also remains an undisputed point of the line, as it was fixed by them. In modern times this crossing has been ascertained to be at latitude 37° 59' 37", longitude 75° 37' 4". The line from Watkins' point to Pocomoke river, fixed by Scarborough and Calvert, skirted the irregular northern shore of Pocomoke sound, taking in no navigable water except what is in the five miles of Pocomoke river below its intersection with the line; a fact which will be seen, in the sequel, to have given a good deal of annoyance to some of the citizens of Maryland. One of our objects in quoting exact language from the report of Scarborough and Calvert is to show that at that day, and by those two men of pre-eminent intelligence, the bay and the river Pocomoke were spoken of, and regarded, as two distinct bodies of water. From what has been said, it is plain that while the two states had very important common interests in the Potomac river, which was a common boundary for 120 miles, they had comparatively trifling common interests in the Pocomoke river; a stream that from 1668 to 1877 constituted no part whatever of a boundary between them, and whose course in Virginia was less than five miles.

The petition of Wharton and Nelson, praying for the writs of habeas corpus under which they are before this court, recites, among other things, as follows:

"By the seventh section of [the compact entered into on the 28th day of March, 1785, between the states of Maryland and Virginia,] it is provided that: Sec. 7. 'The citizens of each state, respectively, shall have full property in the shores of Potomac river adjoining their lands, with all emoluments and advantages, thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river; but the right of fishing in the river shall be common to and equally enjoyed by the citizens of both states; provided, that such common right be not exercised by the citizens of one state to the hindrance or disturbance of the fisheries on the shores of the other state; and that the citizens of neither state shall have a right to fish with nets or seines on the shores of the other.' By the eighth section of said compact, it is provided that: Sec. 8. 'All laws and regulations which may be necessary for the preservation of fish, or for the performance of quarantine in the

river Potomac or for preserving and keeping open the channel and navigation thereof, or of the river Pocomoke, within the limits of Virginia, by preventing the throwing out of ballast, or giving any other obstruction thereto, shall be made with the mutual consent and approbation of both states.' "

The petitioners now before this court, by their counsel, contend that—

"By the true interpretation of the said seventh and eighth sections of the compact of 1785, the citizens of Maryland are lawfully entitled to possess and enjoy and exercise a common right of fishery, including the right to catch and take oysters in the Potomac river and in the Pocomoke river, including what is called 'Pocomoke Sound,' which is a part of said river, being in fact really the mouth thereof."

The petition thus claims that the provision of the seventh section of the compact, giving a common right of fishery, in which the Potomac river, only, is mentioned, and the reasons for which provision were so strenuous as to make them necessary in respect to a great river, forming for 120 miles the boundary between the two states, is to be construed to apply also to a small river, not mentioned in the section, not then forming any part of the boundary, and as to which no such reason for the provision then existed, in any degree. It founds this pretension on no conceivable ground, other than the fact that the Pocomoke river is mentioned in section 8 of the compact, in a clause subsequent to another clause requiring all laws and regulations for the preservation of fish in the Potomac, particularly described in that section, to be made with the mutual consent and approbation of both states.

It is apparent from the language of the petition that the validity of the defense in these cases depends upon the truth of several propositions, viz.:

(1) That the seventh section of the compact of 1785 granted a common right of fishery to citizens of both states in the Pocomoke river, despite the nonmention of that river therein.

(2) That even if the seventh section did not, by omitting the mention of Pocomoke river, contain the grant, yet the eighth section did, by implication and construction.

(3) That the grant of a common right of fishery, thus contained in sections 7 or 8, or both, in the Pocomoke river, carried the right into Pocomoke sound, as part of Pocomoke river. And,

(4) That the grant of a common right of fishery thus derived in Pocomoke sound—that is to say of fishing for running fish, which, until caught, are ferae naturae, and not the subject of private ownership—embraces the right to scrape and dredge for oysters, not only on natural rocks in Pocomoke sound, but on the private plantations granted and taxed there by the state of Virginia, who owns the water and the soil.

Section 7 defines two classes of subjects, in relation to which the laws and regulations made by these states shall be of mutual consent and approbation. The first class embraces laws and regulations necessary for the preservation of fish and for the performance of quarantine in the Potomac river. The second embraces laws and regulations for preserving and keeping open the channel and

navigation of the Potomac, and also of the river Pocomoke, within the limits of Virginia, by preventing the throwing out of ballast, or giving any other obstruction thereto. The compact in section 7, having given common right of fishery in the Potomac river, followed up that provision with a clause requiring all laws and regulations for the protection of this common right in that river to be made with the mutual consent and approbation of both states. And Maryland and Virginia having in 1785 rights of navigation and commerce, under the law of nations, in the Potomac and Pocomoke rivers, which were reciprocal in part, though not common in all, the compact naturally contained a provision requiring laws and regulations for keeping open the channel and navigation of the two rivers within the limits of Virginia to be made by mutual consent; the waters below the mouths of both rivers liable to obstruction being owned by Virginia. There is nothing in section 7 of the compact that can reasonably be held to give a common right of fishery in the waters of the Pocomoke to citizens of Maryland and Virginia, whether running fish or shellfish; the Pocomoke river not being mentioned or referred to in the whole section, and the oyster interests in the Potomac having been so meagre that it can hardly be supposed that they were in the minds of the two states, in stipulating for common rights of fishing in the Potomac.

After the adoption of the compact of 1785, the two states enacted laws for the preservation of fish, and regulations for fishing, in the Potomac river, having the sanction of mutual consent and approbation. They have not done so in respect to the Pocomoke river. Virginia has never enacted such laws, and it has not been shown in the evidence or argument that Maryland has ever proposed them. We are inclined to believe that Maryland has never enacted or proposed them. For 108 years, Virginia, certainly, and we believe Maryland, also, by their nonaction, have given practical refutation to the contention of counsel for petitioners that any grant of a common right of fishing in the Pocomoke river was intended in sections 7 and 8 of the compact.

On this subject, Mr. I. Nevett Steele, of the Maryland bar, in an opinion written at the request of the governor of Maryland, in respect to the present validity of the compact of 1785, remarks, after quoting section 8, as follows:

"The ordinary and grammatical construction of the section would manifestly limit the mutual or joint legislation over the river Pocomoke to the preserving and keeping open of the channel and navigation, and would not extend it to the preservation of fish in the river. If this construction be correct, there is nothing at all in the compact on the subject of fish in the Pocomoke, and consequently nothing upon which any claim of Marylanders to fish there could be founded. The compact, by its previous clauses, having given to Marylanders no right to fish in that part of the Pocomoke river belonging to Virginia, there seems to be no reason why it should give to Maryland the power to legislate for the preservation of fish in that part of the river."

We cannot accede, therefore, to the contention that, because the state of Maryland has never consented to or approved the law

of Virginia under which the petitioners Wharton and Nelson were convicted, therefore that law is inoperative and invalid as against them, as citizens of Maryland, in respect to offenses committed on the Pocomoke river. We are accordingly of opinion that section 2147 of the Code of Virginia is valid as against all offenders, including depredators from Maryland, in the waters of Pocomoke river, though it has not the consent and approval of that state.

Though it is unnecessary, after this ruling, to consider the point so strenuously urged by counsel for the petitioners,—that the exemption, by operation of the eighth section of the compact of 1785, of offenses committed in Pocomoke river by citizens of Maryland, extends to those committed in Pocomoke sound, which is claimed to be part of the river,—yet it is due to the subject, in view of the elaborateness with which the point has been pressed, to examine this claim of identity between the river and the sound, Pocomoke.

Considered either as a question of strict law, or of historical fact, this contention—this claim of identity between these two bodies of water—is equally untenable. We have already shown, by quoting from the report of Commissioners Scarborough and Calvert, made as far back as 1668, that they spoke of the bay and the river as two distinct bodies of water. We have examined all of the early maps of the waters and region embracing this sound and river, and we do not think that in any of them the name "river" is laid upon the sound. In one of the oldest and best of the maps,—that of Augustin Herrman, published in 1673, five years after the settlement of the boundary by Scarborough and Calvert,—the bay and the river Pocomoke are laid down with considerable accuracy as distinct from each other, and are separately designated, the one as "Pocomoke Bay" and the other as "Pocomoke River." Coming down to modern maps, the case is the same; distinct designations appearing in them as "sound" and "river," as in Herrman's map. The first edition of the chart made by the United States coast survey, published between 1850 and 1860, gives a clear delineation of Pocomoke river, and a distinct one, from careful surveys, of Pocomoke sound, placing the name of "Pocomoke Sound" upon the bay. Every later edition of this map of the coast survey exhibits this bay as a distinct body of water, separately designated and distinguished from the river.

It is true that Maryland has long manifested a decided dissatisfaction with the boundary line of 1668, prescribed by Scarborough and Calvert, but her chief contention was that the line should not have been placed so far north as to have left the whole of Pocomoke sound in Virginia. As the result, in part, of this dissatisfaction, a commission was finally appointed to readjust the boundary lines, generally, between Maryland and Virginia. The commissioners were Jeremiah S. Black, Charles A. Jenkins, and James B. Beck,—all men of distinction, and enjoying the confidence of the public in the highest degree. The boundaries of the two states were settled by them in an award dated January 16, 1877. This award was accepted by the two states, and was ratified by

congress by its act of March 3, 1879, hereinbefore cited. This settlement possesses every element of finality and unimpeachability. It has not only the unqualified acceptance of the two states, but has also the ratification of congress at the instance of both states. It has the merit of extraordinary fullness, accuracy, and clearness of description, in setting out the lines of boundary which it establishes. It leaves not in doubt a single point, or a single line confusedly or inaccurately delineated. Observe how precise its language is in defining the line east of Watkins' point, with which we have to do in the case at bar; and that Maryland is given part of Pocomoke sound, by the fixing of the line far enough below that of Scarborough and Calvert to leave a strip of the sound about a mile wide, for a distance of 14 miles within her limits. The arbitration of 1877, in respect to that part of the boundary line which lies east of Watkins' point, after fixing that point at latitude 37° 54' 38", longitude 75° 52' 44", goes on to say with great precision of description:

"From Watkins' point the boundary line runs due east 7,880 yards, to a point where it meets a line running through the middle of Pocomoke sound which is marked 'C' on the accompanying map, and is in latitude 37° 54' 38", longitude 75° 47' 50"; thence, by a line dividing the waters of Pocomoke sound, north, 47° 30' east, 5,220 yards, to a point in said sound marked 'D' on the accompanying map, in latitude 37° 56' 25", longitude 75° 45' 26"; thence, following the middle of the Pocomoke river by a line of irregular curves, as laid down in the accompanying map, until it intersects the westward protraction of the boundary line marked by Scarborough and Calvert, May 28th, 1868, at a point in the middle of Pocomoke river, and in the latitude 37° 59' 37", longitude 75° 37' 4"; thence, by the Scarborough and Calvert line, which runs 55° 15' north of east, to the Atlantic ocean."

The misprint of "1868" for "1668" has already been adverted to.

This language of the Black-Jenkins award of 1877 has been quoted for two purposes—First, in order to show that this latest historical document relating to this boundary—just as that of 1668 had done—particularly distinguishes the sound from the river Pocomoke, by two distinct mentionings of each; and, secondly, to show that the settlement of 1877 left no part of this portion of the boundary between the two states "doubtful." It is proper to observe that the United States coast survey, in its maps, has extended the river, so-called, westward of its proper mouth, to the narrows abreast of Meramscot creek, which is 12 miles south and southwest of the crossing of the river by the Scarborough-Calvert and Black-Jenkins line. It is to be also observed that the Black-Jenkins award adopts the map of the United States coast survey in designating the boundary line east of Watkins' point, and, in designating the river as distinct from the bay, makes the river commence nearly abreast of Meramscot creek. In concluding this part of the subject, we think we can say, with truth, that there is no map of these waters, and no joint official document existing in relation to them, which has confounded the river with the sound, or claimed that the sound is the river, or any part of the river, Pocomoke.

We conclude from what has been said that the eighth section of the compact of 1785 does not require that the laws and regulations established by Virginia for the preservation of fish, more particularly shellfish, in the Pocomoke river, shall have the consent and approbation of Maryland, and that, even if it did so, such requirement cannot be applied to Pocomoke sound, which is not the river, is no part of it, and is immeasurably superior to it in value and importance. This sound is 90 square miles in area, containing the most valuable oyster beds in Virginia or Maryland, and is of such extent and importance as to forbid the supposition that Virginia would have granted away her jurisdiction over it in any other than express, precise, formal, and solemn terms. There having been no grant of a common right of fishing in the Pocomoke river, no right can be derived, by inference, of common fishing in Pocomoke sound; and, there having been no grant of a common right of fishing for fish either in the river or the sound, there can be no right, derived by inference, of common fishing for oysters in either of these waters. If Virginia had intended to grant away the valuable rights now claimed by Maryland, it is fair to assume that she would not have subjected the beneficiaries of the grant to the necessity of resorting to extraordinary inferences and constructions for realizing and enjoying the fruits of the grant. It would have been her duty to have used apt and proper words for executing her purpose, and to have been just as explicit and frank in the language of the eighth section of the compact as she was in that of the seventh.

In support of their contentions based on section 8 of the compact of 1785, which have been shown to be inadmissible in the foregoing paragraphs, counsel for the petitioners cite the language used by one of the judges in the decision of the supreme court of appeals of Virginia in the case of Hendricks v. Com., 75 Va. 934. In that case, George Hendricks, a citizen of Maryland, was indicted in the county court of Fairfax county for "unlawful fishing" in the Potomac river. He contended that he was entitled to be tried in a court in Maryland, and could not be tried in a court of Virginia, because the law which he was charged with violating had been passed by the mutual consent and approbation of both states for the regulation of fishing in the Potomac river, and because another law, passed by like mutual consent, had given citizens of Maryland violating the first-named law the right of trial in a Maryland court. His contention was perfectly sound, and the Virginia court of appeals sustained this defense. The trial related exclusively to the Potomac river. It involved the question of the common right of fishery in that river, given by the seventh section of the compact of 1785. It also involved certain laws and regulations passed by both states for the protection of that common right of fishing in the Potomac river, passed in pursuance of the first clause of section 8 of that compact. There was no question in the case concerning Pocomoke river. But the justice delivering the opinion of the

court, in examining the question of the jurisdiction of the two states over an offense charged to have been committed on the Potomac river, used the following language:

"By article 8, all laws and regulations which may be necessary for the preservation of fish in the river Potomac or the river Pocomoke, within the limits of Virginia, shall be made with the mutual consent and approbation of both states. The effect of this article is to give to the state of Virginia concurrent jurisdiction with the state of Maryland over the Potomac from shore to shore, and over that part of the Pocomoke river which is within the limits of Virginia, to enact such laws, with the consent and approval of Maryland, as may be deemed necessary and proper for the preservation of fish in said waters."

The court here refers to section 8 of the compact of 1785 without quoting it, although the mere quotation of it would have shown the fallacy of its language in respect to the Pocomoke river. So far as the Pocomoke river was concerned, the language of the court was obiter dictum, upon a point not argued or even mentioned in the case; and Mr. Steele, in his opinion written for the governor of Maryland, before referred to, very naturally says:

"I think it may well be doubted whether the court of appeals of Virginia would consider what is there said about the Pocomoke river as a binding decision of that learned tribunal."

Few instances can be cited in which the obiter of a court has sown the seeds of greater mischief than this of the Virginia court of appeals in the Hendricks Case. It has instigated the depredations of Marylanders upon the private oyster properties of Pocomoke sound, of which the newspapers are full. It has brought these cases before this court. Yet, in using the language of the obiter part of its decision, that court did not hold that Pocomoke sound was Pocomoke river, and its obiter has no application to the case at bar. Nor did the court say that the eighth section, in which it stipulated in regard to a common right of fishery, "included the right to take oysters in the Pocomoke river."

The petitions of Wharton and Nelson must be disallowed, and the prisoners remanded to the custody of the sheriff of Accomack county.

Coming now to the consideration of the case of Marsh, it is to be observed that his offense is charged to have been committed on Hurley's rock, which the indictment alleges to be within the limits of Virginia, near the line of boundary lying between Smith's point, on the Potomac, and Watkins' point. The defense is that that part of the boundary is "doubtful," and that the prisoner is entitled to the privilege granted by the tenth section of the compact of 1785, which stipulates that offenses committed by citizens of Maryland within the limits of Virginia on that part of Chesapeake bay where the line of division between Smith's point and Watkins' point may be doubtful, shall be tried in a court of Maryland. As a matter of historical fact, no part of the line between Maryland and Virginia was at the date of the compact of 1785 more doubtful than the part between Smith's and Watkins' points, and no law could be

more just and judicious than the tenth section of the compact of 1785, containing the provisions relied on. But the able and distinguished commissioners appointed by the two states in 1877 had in charge the very duty of making certain and determinate all doubtful parts of the common boundary of the two states. Accordingly, the commission addressed itself to the task of removing all doubt from this part of the line, as well as others, and accomplished its purpose successfully. Probably no section of a boundary line was ever more clearly, precisely, minutely, definitely, or intelligibly laid down and defined than was the portion of the Maryland and Virginia line between Smith's and Watkins' points, and which may be found on pages 63, 64 of the Virginia Code, and page 482 of the twentieth volume of the Statutes at Large of the United States.

It is useless, in this opinion, to set out the careful language of the award in defining this line. The duty of the arbitrators was to make it cease to be doubtful, and to establish the line with precision and certainty. They performed that duty, and accomplished that purpose. The line is no longer doubtful, and the defense of the prisoner Marsh is inadmissible. It was competent for the Virginia court by which he was convicted to try him, and he must be remanded to the custody of the sheriff of Accomack county, Va.