# Button et al. v. Hikes.

March 19, 1943.

Rehearing Denied Dec. 17, 1943.

Lawrence Grauman for appellant.

J. Verser Conner and John K. Skaggs, Jr. for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

The appellants, constituting the Jefferson County Board of Supervisors of Tax, listed for taxation for the year 1941 the appellee's right to receive from life insurance companies income during her life payable in accordance with the terms of a "mode of settlement" selected by the insured, her deceased husband. The Jefferson County Quarterly Court, on appeal, adjudged the assessment to be erroneous and void. A similar decision was rendered by the Circuit Court on appeal to that tribunal by the Board, and it is this decision we are called upon to review.

The facts pertaining to the policies, the insured, the beneficiary and her rights thereunder, together with the testimony which actuaries and bankers would give concerning the extent, value, and salability of such rights, were stipulated; and, in order that the scope of this opinion may not be extended beyond its actual intent, we set forth the stipulation, omitting surplus verbiage, and a summary of the testimony:

"(1) Samuel L. Hikes, a * * * resident of Jefferson County, Kentucky, died in that County on January 10th, 1940, at the age of 58 years * * *. He was survived by his widow, the appellant, Verna Ray Hikes, and by the following children:

Kenneth Hikes, born October, 1913

Margaret Hikes Sutherland, born March 19, 1917,

Verna Ray Hikes, born August 24, 1924

Said children still survive, and there are two infant children born to Margaret Hikes Sutherland. No other descendants survive the said Samuel L. Hikes.

"(2) Between the years 1922 and 1931, Samuel L. Hikes procured policies of insurance on his own life * * * issued respectively by the Northwestern Mutual Life Insurance Company, * * * The Connecticut Mutual Life Insurance Company, * * * The Equitable Life Assurance Society of the United States * * *.

"(3) Prior to the year 1935, * * * Samuel L. Hikes retained all rights to change the beneficiary in said several policies and complete control over said policies.

"(4) In December, 1935, the insured surrendered all incidents of ownership in the policies issued by the Northwestern Mutual Life Insurance Company, and in said month entered into beneficiary agreements with the said Insurance Company; and in the month of February, 1936 entered into beneficiary agreements with the Equitable Life Assurance Society of the United States, and the Connecticut Mutual Life Insurance Company, whereby the rights of all beneficiaries under said policies were fixed and said agreements were in effect on the date of the death of the said Samuel L. Hikes, and are still in effect, and control and govern the rights of the beneficiaries under said policies.

"(5) The interests of Verna Ray Hikes, Widow of Samuel L. Hikes, sought to be taxed in this case, are the rights which she acquired and now enjoys under the terms of those beneficiary agreements.

"(6) Though differing in form and language, as between the three Companies, insofar as the rights of Mrs. Hikes herein were fixed by said agreements, they are substantially similar and (omitting provisions which would have been applicable had Mrs. Hikes predeceased the insured) may be summarized thus:

"(a) It was thus provided that upon the death of the insured, Mr. Hikes, the several Companies agreed to pay to Mrs. Hikes, during her lifetime, interest on the proceeds of the policies at such rates as might be fixed by the respective Companies, but not less than three per cent per annum, discounted by reason of the fact that said payments were made monthly instead of annually.

"(b) Said policies provided that in addition to the interest payments mentioned, the several Companies will pay to Mrs. Hikes such interest dividends, if any, as may be declared annually by the respective Companies.

"(c) It was further provided that after the death of the said Mrs. Hikes, the interest upon said proceeds should be paid to the surviving children, or grandchildren, with limited rights of withdrawal by said children of installments of principal upon reaching certain ages of 30 and 35, in case of the sons, and 45, in case of the daughters. It was further provided that in the event Mrs. Hikes should survive all of her children

and all their children, she might elect to have the proceeds of said policies payable to her in certain installments over a period of years. Under no circumstances can Mrs. Hikes receive any of the proceeds of said insurance, except in the event she survives all her children and their descendants; nor can she dispose of or direct the payment of said proceeds by will or in any other manner, except in the event that she should outlive all of her children and their descendants.

"(d) In the event of the death of all of said children and all the descendants of said children, and of Mrs. Hikes, then the remaining proceeds of said insurance, if any, shall be paid to the estate of the last one of said persons to die, to-wit, Mrs. Hikes, her children and grandchildren.

"(e) Each of said policies provides that the right is withheld from Mrs. Hikes to commute, assign, alienate, anticipate or pledge any of the sums or instalments payable under the terms of said policies.

"(f) Upon the death of Mrs. Hikes, all her rights under said policies shall immediately terminate, except as to any interest installment due but unpaid at the time of her death; and neither her estate, heirs, devisees, or assigns have or can acquire any claim against said Insurance Companies.

"(7) The following table shows the amount upon which the interest paid to Mrs. Hikes by each of the Companies is calculated, and the amount actually paid to her in the year 1941, the only full year since the death of Mr. Hikes:

| Name of Company | Amount of Proceeds upon which interest is paid | 1941 |
|---|---|---|
| Northwestern Mutual Life Insurance Company | $101,520.62 | $3,496.32 |
| Connecticut Mutual Life Insurance Company | 42,296.30 | 1,456.68 |
| Equitable Life Assurance Society of the United States | 40,026.08 | 1,229.64" |

Summary of Stipulated Testimony.

(1)   The Insurance Companies have not segregated any assets of any character as applicable to or answerable for the policies in question; and, in so far as appellee's rights are concerned, the principal amounts named are without significance unless she survives her children and grandchildren, except to the extent that they furnish the basis for the calculation of the interest and dividends to which she may become entitled if she lives.

(2)   Because of the agreement between the insured and the Companies, they would decline to recognize any assignment by appellee of her rights under the policies. The actuaries of the Companies knew of no instances where such rights had been sold.

(3)   Mortality tables reflect the death or survival of groups, and furnish no basis for predicting how long any individual will live.

(4)   It is not possible to determine the fair cash value of appellee's interest in the policies estimated at the price they would bring at a fair voluntary sale, because of the unlikelihood of finding a buyer, and the inability to predict the duration of her life.

(5)   Banks do not regard such rights as appellee possesses under the policies as acceptable collateral for loans larger in amount than the installments accruing thereunder within thirty days.

The Circuit Court adjudged the assessment erroneous and void because, as stated in the judgment, "the rights and interests of said Verna Ray Hikes under the insurance contracts described herein have no fair cash value or value that can be estimated at the price same would bring at a fair sale, according to the meaning and intent of Section 172 of the Constitution." The appellants insist that the proper assessment valuations were determinable by the Wigglesworth Mortality Table showing the value of life rights, in accordance with our decision in the case of Commonwealth ex. rel., etc. v. Sutcliffe, 283 Ky. 274, 140 S. W. (2d) 1028, 2d appeal, 287 Ky. 809, 155 S. W. (2d) 243. Appellee not only attempts to distinguish these cases from the case at bar, but assails the conclusions therein reached. Among other grounds for affirmance of the Circuit Court's judgment,

she urges that, notwithstanding the statement contained in KS sec. 4022 (KRS 132.010), that for the purpose of taxation personal estate shall include every species and character of property other than real estate—"that which is tangible as well as that which is intangible," it was not the Legislative intent to subject rights arising under insurance policies to ad valorem taxation, a contention which, if sustainable, will eliminate the necessity for considering all other questions argued by counsel for the respective parties.

Ordinarily the inquiry whether a thing is of a species or class should begin with definitions, but the word "property" is so all-embracing as to include within its definition every physical object, intangible benefit, and prerogative susceptible of ownership, possession, or disposition; from which, it is apparent that the meaning of the word, when used in a legislative act, must be gathered from the then prevailing concepts as reflected by contemporaneous construction. The addition of descriptive phrases, such as "of all species and character," but increases that necessity if absurdities are to be avoided, since the clear import of such words is to remove all other limitations.

An examination of the Statutes of this State imposing ad valorem taxes, beginning with the first enactment (June 22, 1792) which specified the articles of personalty to be taxed and the rates in pence and shillings, discloses no mention of insurance policies or rights secured thereby. The language of the present Statute (KRS 132.010) first appears in the Act of May 17, 1886; but its intention is embodied in the fifth paragraph of Article I, Chapter 92 of the 1873 compilation of the General Statutes, which reads as follows:

"The assessor, after having taken the lists of all property required to be listed, as above, shall require each person, on oath, to fix the amount he or she is worth from all other sources on the day to which said list relates, after taking out his or her indebtedness from said amount. And the said assessor shall take from the said amount so assessed and listed the sum of one hundred dollars, and set down and list the balance for taxation. This section includes all property not exempt from taxation, other than that mentioned in section four, (enumerating specific articles of personalty) whether manufactured, produced, purchased, or

otherwise procured, such as spirituous liquors and all mixtures thereof, the produce of mines, farms, forests, and other productions of the earth, manufactured articles of all kinds, and all property of every sort and description, notes, accounts, bonds, bills of exchange, and choses in action, debts, and demands of every kind; but does not include lands or other property not within this State, subject by law to tax, and actually taxed, by the State or County where situated, nor bank or other stocks when the bank or other institution or corporation in which it is held is required to pay tax on the same.''

Yet, never prior to 1940, as far as we are aware, have the officers charged with the duty of assessing property for taxation, sought to include among taxable items rights arising under insurance policies. Although it has frequently exercised the power to classify personal property for taxation at differing rates, conferred by the 1915 amendment to Section 171 of the Constitution, the Legislature has signally failed to establish a rate or to establish a mode for the valuation or assessment of insurance policies or the rights accruing thereunder. Are we to assume that the law makers intended, not only that such rights should be valued according to mortality tables, but taxed at the rate prescribed for intangibles other than those accorded special treatment? Are we to assume that for one hundred and fifty years the assessors and collectors of tax, as well as the taxpayers, have been derelict in their duty? It is estimated that there are approximately 500,000 policies of life insurance outstanding on the lives of Kentucky citizens, and that it would consume approximately seven years' income, where benefits under such policies are paid in installments, to satisfy the demands of the tax gatherers for omitted taxes with penalties and interest if the rights to such benefits have been subject for as much as ten years to assessment for ad valorem taxation. Are we to be heedless of the consequences which would ensue should we disregard the construction placed upon the Statutes by their creators and enforcers?

We are aware that it had been written that the doctrine of contemporaneous construction is properly applicable only where ambiguity and uncertainty exist in the enactment to be construed; but we are of the opinion that such uncertainty exists in a taxing Statute so general in its terms, by reason of the definitions em-

ployed, as to make taxable, through the extension of those definitions to their utmost limits, not only those things generally regarded as properly subject to taxation, but others which, historically, have been considered by the public, as well as the lawmakers, to be immune.

The latest decision of this Court employing the doctrine of contemporaneous construction in determining whether a certain type of personal property was exempt from taxation is Reeves, Commissioner of Revenue et al. v. Louisville Gas & Electric Company, 290 Ky. 25, 160 S. W. (2d) 391, 395, in which we said:

"This confusion and indifferent references to an Act twice repealed and re-enacted with amendments indicates a lack of care which would not have existed had the legislature understood or regarded the reference in the proviso as having the constructive effect of imposing taxes of so great involvement and of so large amounts as the appellants contend it had during all this time. Had that been intended the legislature would have spoken certainly and specifically.

"Added to this attitude of the legislature is the recognition of exemptions of manufacturing machinery of the several public service corporations in Louisville for a period of twenty-three years by all local tax administrative boards and officers of Jefferson County and the City of Louisville, and for a lessor period, since 1927, by the state agencies who have had the duty of assessing the property, tangible and intangible, of such companies for local taxation. The understanding of and application by those charged with the duty of construing and executing the law when it first came into operation has been sanctioned by long acquiescence by their successors in office. While no contemporaneous construction by administrative officers can be allowed to defeat the plain purpose and language of a statute, this construction by the executive branches of the state and city governments, and the failure of the legislature during the years to make it clear that such was not its intent, afford an exceptionally strong case for resort to the rule. City of Louisville v. Louisville Water Company, 105 Ky. 754, 49 S. W. 766; Cave Hill Cemetery Company v. Gosnell, 156 Ky. 599, 161 S. W. 980; Barker v. Crum, 177 Ky. 637, 198 S. W. 211, L.R.A. 1918F, 673."

The leading case on the question whether life insurance policies are legally subject to taxation under an act purporting to tax all property other than that expressly exempted is State Board of Tax Com'rs et al. v. Holliday et al., reported in 150 Ind. 216, 49 N. E. 14, 19, 42 L.R.A. 826, decided by the Supreme Court of Indiana on January 12, 1898, from which we quote the following excerpt:

"In order to ascertain the intention of the legislature, the court should look to the letter of the statute, to it as a whole, to the circumstances under which it was enacted, to the old law, if any, to the mischief to be remedied, to other statutes, to the rules of the common law, and to the condition of affairs when the statute was enacted. Humphries v. Davis, 100 Ind. 274, (50 Am. Rep. 788); Middleton v. Greeson, 106 Ind. 18, 5 N.E. 755; Wasson v. [First Nat.] Bank, 107 Ind. 206, 8 N.E. 97; May v. Hoover, 112 Ind. 455, 14 N.E. 472; Parvin v. Wimberg, 130 Ind. 561, 30 N.E. 790 [15 L.R.A. 775, 30 Am. St. Rep. 254]. Suth. St. Const. sec. 311, says: 'The contemporary and subsequent action of the legislature in reference to the subject-matter has been accepted as controlling evidence of the intention of a particular act.' Here, for a period of over 40 years, numerous tax laws in effect as broad and comprehensive in the language employed as to the property embraced as the tax law of 1891, had been constantly acted upon and construed by both officers and property owners as not including life insurance policies as subjects for taxation. And the taxing officers and taxpayers of the several states of the Union had construed similar taxing laws in a similar way. Up to that time no attempt had been made, so far as we are advised, by any civilized government, either by legislative, executive, or administrative action, to select and treat life insurance policies as property which ought to be taxed, and subject them to taxation. These are the circumstances under which the legislature acted in passing the tax law of 1891. The presumption is that these historical facts were known to the legislature. Mode v. Beasley, 143 Ind. 306, 42 N.E. 727. Suth. St. Const. sec. 333, says: 'It is presumed that the legislature is acquainted with the law; that it has knowledge of the state of it upon subjects upon which it legislates; that it is informed of previous legislation, and the construction it has received.' Therefore the legislature, with knowledge

that all the previous tax laws, practically the same as the tax law it passed in 1891, had been construed by all the officers charged with their execution, as well as by the people affected by them, as not including life insurance policies, it would be most unreasonable to suppose that the legislature, by the use of words we have quoted from the act, intended to include such policies as subjects for taxation. In the light of all these facts, the intent not to so include them seems apparent, because, as is said by Suth. St. Const. sec. 333, 'If it were intended to exclude any known construction of a previous statute, the legal presumption is that its terms would be so changed as to effectuate that intention.' Nor do we mean by this that, in order to subject property to taxation, it shall be specifically named in the statute. Far from it. Much the larger part of personal property is subjected to taxation by legislative action under the general designation of 'personal property.' But we are dealing with the question of interpretation and legislative intent. But there is still a stronger reason for the conclusion that the legislature did not intend to include life insurance policies by the tax law of 1891 as subjects for taxation, and that is the fact that the act provides no regulations for their valuation. In that and subsequent statutes the legislature has provided special regulations for the valuation of all those classes of property that are difficult to value different from that provided for ordinary property, and many of them not as difficult as life insurance policies; for instance, the property of banks and bankers, foreign corporations, such as insurance companies, telegraph companies, telephone companies, express companies, sleeping-car companies, railroads, and the like. Special regulations are provided by statute for valuing for taxation the several classes of property above mentioned. And the question arises, why did the legislature provide no regulations for the valuation of life insurance policies if it intended to include them by the language we have quoted from the tax law of 1891.''

The Court's conclusion was that life insurance policies were not taxable. See, also, In re Laub, 104 Neb. 402, 177 N.W. 749.

Of course, if the framers of the Constitution regarded rights arising out of life insurance policies as property, the legislative intent would be immaterial, since that document requires that all property, not spe-

cifically exempted by its terms, be taxed. Sections 172, 174. But what we have said relative to the proper method to be employed in ascertaing the legislative intent is equally applicable in determining whether the framers of the Constitution regarded such rights as property. That they did not is manifest from the fact that the fourth and present Constitution adoped September 28, 1891, does not define property subject to taxation, or in any other manner indicate an intention to depart from the construction placed upon that term by the preceding Legislatures and assessing officers. It is true that the Constitutions of 1792, 1799, and 1850 were silent on the subject of taxation, but, as said by this Court in the case of Holtzhauer v. City of Newport, 94 Ky. 396, 22 S. W. 752, 754, relative to the present sections 171, 174, the latter of which requires that all property not exempted shall be taxed in proportion to its value:

"It is thought, however, that the method of assessment provided for in the acts in question is in violation of sections 171 and 174 of the constitution. These sections require uniformity of taxation, and taxation according to value. While they were not in the former constitution, the principles contained therein have always been recognized as the basis of all taxation. They announce nothing new, but are merely declaratory of what was always the law of taxation in this state."

Appellants argue that the rights sought to be taxed cannot be distinguished from the interests held to be taxable in the first of the Sutcliffe and other cases. It must be conceded that they are similar in the uncertainty of their value, duration, and other particulars; but this does not alter the fact that the interests held taxable arose out of the transmission by will or inheritance of recognized forms of property, and that estates so created almost universally have been regarded as property, while interests created by life insurance policies have not. We are not concerned with the question whether the latter should be taxed, but whether the framers of the Constitution intended to tax them.

Judgment affirmed. Whole Court sitting.

Chief Justice Fulton dissenting.

In view of our decision in Com. v. Sutcliffe, 283 Ky. 274, 140 S. W. (2d) 1028, I am unable to concur in the

majority opinion. We held there that the right to receive income from securities held under a trust was property subject to ad valorem taxation, even though the securities from which the income arose might have been taxed in another state.

It seems to me that the right of Mrs. Hikes to receive monthly income from the proceeds of the insurance policies, at not less than 3% per annum, is more clearly property subject to ad valorem taxation than was the beneficiary's right in the Sutcliffe case. The status of Mrs. Hikes is similar to that of one holding promissory notes of the insurance companies calling for the payment of a minimum sum monthly during her life time and it is beyond question that notes of this character would be taxable.

The majority opinion impliedly, if not expressly, concedes that her right to receive this income is property under princples enunciated in the Sutcliffe case and that it would be taxable had it not had its inception in insurance policies. The opinion then holds this property right non-taxable upon the theory that it is sought to lay a tax upon insurance policies. This premise, upon which the opinion is founded, is, I think, a fundamental error since the insurance phase of the transaction giving rise to the property right ended with the death of Samuel L. Hikes, the policies maturing when he died. It can not be doubted that if the policies had been payable in a lump sum and the proceeds deposited in a bank such proceeds would be subject to taxation even though they had their origin in an insurance policy. No attempt is made to tax insurance policies. On the contrary, the attempt is to tax a property right similar to a promissory note, the consideration for which is the right of the insurance companies to retain the cash due the beneficiary of the policies.

But, even though the right sought to be taxed be considered to be one arising under an insurance policy, I am of the opinion that it is taxable under the principles enunciated in the Sutcliffe case. The majority see an intention upon the part of the makers of the constitution that property rights arising out of insurance policies should not be taxed. I find no source from which to gather such an intention. Certainly, the mere fact that rights similar to the one here involved had never been taxed at the time of the adoption of the constitution

affords no reason for surmising such an intention. If such a surmise were justified, then the Sutcliffe case is unsound since a right such as the one there subjected to taxation had never been taxed when the constitution was adopted. Other instances might be mentioned in which new forms of property have been taxed although such property had not been conceived to be taxable when the constitution was adopted. New concepts of taxation and of what constitutes taxable property are constantly springing into being. This is as it should be, in view of the constant ingenuity exercised by taxpayers in devising methods to place property beyond the purview of taxing statutes, and the taxing authorities should not be discouraged in their efforts to tax every available species of property.

The intention of the makers of the constitution is to be gathered only from the constitution itself, with the aid of such light as is shed by what was said by the makers at the time of its adoption. Section 172 of the Constitution provides that "All property, not exempted from taxation by this Constitution, shall be assessed for taxation at its fair cash value * * *." There is no pretense that the property right in question was expressly exempted by the constitution. Prior to the adoption of the present constitution exemptions from taxation were left to the Legislature and it was one of the purposes of the makers of the constitution to divest the Legislature of this function. The Debates of the Constitutional Convention of 1890, Volume II, pages 2372 to 2844, disclose that one of the chief concerns of the constitution makers was that no form of property, except that exempted by them, should escape taxation and that they regarded the provisions of Section 172 as broad enough to cover "everything of value belonging to any person * * * every available species of property." Page 2437 of the Debates. The Debates are replete with similar expressions indicating an intention squarely opposed to that which the majority attribute to the makers of the constitution.

Any intention of the makers of the constitution to permit any conceivable form of property, except such as was exempted by them to escape taxation is so completely dispelled by what they said when the constitution was adopted as to render wholly illusory the intention, attributed to them by the majority opinion,

to exempt property rights arising under insurance policies.

The wording of Section 172 could not be more all inclusive. Were there need to look beyond the constitution itself to ascertain the meaning of the words, "All property," then such legitimate light as is thrown thereon reveals a meaning contrary to that expressed in the majority opinion.

Judges Cammack and Thomas concur in the views herein expressed.