COMMONWEALTH of Kentucky et al.,
Appellants,

v.

HENDERSON COUNTY, Kentucky, et al.,
Appellees.

OHIO RIVER OIL COMPANY, Inc.,
Appellant,

v.

HENDERSON COUNTY, Kentucky, et al.,
Appellees.

Henry B. WALKER et al., Appellants,

v.

HENDERSON COUNTY, Kentucky, et al.,
Appellees.

Court of Appeals of Kentucky.

March 22, 1963.

Rehearing Denied Oct. 25, 1963.

John B. Breckinridge, Atty. Gen., Troy D. Savage, H. N. McTyeire, Asst. Atty. Gen., Frankfort, for the Commonwealth and others.

Funk, Chancellor & Marshall, Chat Chancellor, Frankfort, for Ohio River Oil Co., Inc.

L. Allen Rhoads, Henderson County Atty., Henderson, and Byron, Sandidge, Holbrook & Craig and Morton Holbrook, Owensboro, for Henderson County.

B. M. Westberry, Crittenden County Atty., Marion, for Crittenden County.

J. D. Ruark Union County Atty., Morganfield, for Union County.

Shelby Denton, Daviess County Atty., Owensboro, for Daviess County.

H. G. Black, Hancock County Atty., Hawesville, for Hancock County.

S. H. Monarch Breckinridge County Atty., Hardinsburg, for Breckinridge County.

Walker & Walker and Henry B. Walker, Jr., Evansville, Ind., Palmore & Mitchell, Henderson, and Dailey & Fowler, Frankfort, for Henry B. Walker and others.

John K. Knodell, Jr., Mattoon, Ill., for Humble Oil & Refining Co.

Alfred A. Kiltz, Mt. Vernon, Ind., pro se and for Ray Ryan and others.

William T. Carroll, Owensboro, for Farm Bureau Oil Co., Inc.

MILLIKEN, Judge.

The discovery of oil and gas about ten years ago under the bed of the Ohio River between the thread of the stream and the Indiana shore lured the usual developers whose rights are at stake in this litigation. Essentially there are three classes of parties: (1) the counties bordering the area and their lessees; (2) those claiming under patents of the river bed north of the thread of the stream; and (3) the Commonwealth claimants under a lease executed by the State Property & Building Commission. The trial court judgment sustained the claims of the counties and their lessees, found the patents void, and concluded that the State Property & Building Commission had no legal authority over the land in question. It is conceded that the sovereign jurisdiction of Kentucky covers the area and that the determination of the issues presented turns on the interpretation and applicability of certain Kentucky Statutes.

This litigation began eight years ago in the United States District Court for the Western District of Kentucky where that Court construed the principal Kentucky Statutes involved in a way directly opposite to the State Court construction in the presently appealed, later judgment. Walker v. Felmont, 136 F.Supp. 584 (W.D.Ky., 1955). The United States District Court judgment was reversed by the United States Court of Appeals for the Sixth Circuit, not on its merits, but upon the ground that the Federal Courts should decline to pass judgment on the important statutory questions presented until the courts of the State had an opportunity to pass upon them which, in a sense, involve the public policy of the State. Walker v. Felmont, 240 F.2d 912 (Sixth Circuit, 1957). After a denial of certiorari by the United States Supreme Court in 1959, Walker, Trustee v. Felmont Oil Company, 361 U.S. 840, 80 S.Ct. 61, 4 L.Ed.2d 78, the United States District Court issued its final order dismissing the action which eventuated in the present action in the Henderson Circuit Court whose judgment is here appealed.

■ The historical incidents underlying the establishment of the north or northwest low watermark of the Ohio River as to the boundary of Kentucky are set out in great detail in two decisions of the United States Supreme Court. Handly's Lessee v. Anthony, 5 Wheat. 374, 18 U.S. 374, 5 L.Ed. 113, decided at the February term, 1820, with opinion by Chief Justice Marshall, and State of Indiana v. State of Kentucky, 136 U.S. 479, 10 S.Ct. 1051, 34 L.Ed. 329, decided at the October term, 1889, with opinion by Mr. Justice Field. It is pointed out in those cases that even prior to the adoption of the United States Constitution, the Virginia Legislature authorized its congressional delegation to cede to the central government what was then referred to as the Northwest Territory and that such a cession was actually made by formal deed of March 1, 1784. It is further shown by those decisions that the cession of the Northwest Territory to the central government left

all of the Ohio River to its northern or northwestern low watermark within the territorial confines of that part of Virginia which later became Kentucky through the admission of this Commonwealth into the Union in 1792.

■ Furthermore, it has been established that an individual Kentucky landowner whose lands border on the Ohio River owns only to the thread of the river, while the ownership of the Commonwealth of Kentucky in its sovereign capacity extends to the low watermark on the northern or northwestern side of the river. Berry v. Snyder, 66 Ky. 266; Miller v. Hepburn, 71 Ky. 326; Louisville Bridge Company v. City of Louisville, 81 Ky. 189; Ware v. Hager, 126 Ky. 324, 103 S.W. 283; Bedford-Nugent Company v. Herndon, 196 Ky. 477, 244 S.W. 908; McGill v. Thrasher, 221 Ky. 789, 299 S.W. 955; City of Covington v. State Tax Commission, 231 Ky. 606, 21 S.W.2d 1010; Louisville Sand & Gravel Company v. Ralston, Ky., 266 S.W.2d 119; Handly's Lessee v. Anthony, 5 Wheat. 374, 18 U.S. 374, 5 L.Ed. 113; State of Indiana v. State of Kentucky, 136 U.S. 479, 10 S.Ct. 1051, 34 L.Ed. 329.

The decision of this case turns on the construction and application of three statutes: KRS 56.190 and 56.320, which we shall refer to as the Patent Statutes; KRS 56.220, which we shall call the County Leasing Statute; and KRS 56.463, the Building Commission Statute. Regardless of their respective origins, each was re-enacted in 1942 when the Kentucky Revised Statutes were adopted, and each is currently effective unless we find that a repeal or modification by implication has occurred.

In summary, the Patent Statutes (KRS 56.190–56.320) prescribe that the patenting of any "vacant and unappropriated" land may be had by applying to the county court of the county where the land lies and paying the price fixed therefor "into the county treasury." The Building Commission Statute (KRS 56.463) authorizes the Commission:

"(1) To determine the comparative needs and demands of the various state agencies * * *.

"(2) To purchase, lease or rent such real estate as the department (Commission) may find to be necessary for use by the state or any state agency * *.

"(3) To sell and convey any real estate owned by the state or by any state agency, found by the department (Commission) not to be needed for public use or to have become unsuitable for such use. * * *

"(6) To lease any real estate or any part thereof, now owned or hereafter acquired by the state or by any state agency, * * * when the department (Commission) finds as a matter of fact that the real estate or any part thereof is not needed for state purposes * *."

The only statute dealing specifically with land in the Ohio River north of the thread of the stream is the County Leasing Statute (KRS 56.220) which declares in toto:

"All that portion of the bed of the Ohio River, lying north of the thread of the stream, except accretions to islands privately owned, is declared to be vacant and unappropriated land, and the county court of each county bordering on the Ohio River may use or lease the river bed for county purposes, upon such terms and conditions as to it seem beneficial to the county. Any contract of leasing made by any such county court of such river bed for any sand and gravel rights for or on behalf of the county, conveys full right and title to the lessee to the exclusive use of all sand and gravel deposits in the river bed to the extent embraced in the lease."

We shall refer to the three categories of claimants as the (1) patentees, (2) the Commission, and (3) the counties.

I. The Patentees

Both the United States District Court and the Henderson Circuit Court concluded that

the patentees' claims had to be denied, the latter court adopting the detailed opinion of the Federal Court on this issue, a course which we too shall follow in part. In its detailed opinion (Walker v. Felmont, 136 F.Supp. 584), the Federal Court declared:

"In their complaint the Patentees allege complete compliance with the laws of Kentucky providing for the appropriation of vacant and unappropriated lands and assert the validity of certain patents issued in 1938 to portions of the Ohio River bed north of the thread of the stream. These patents, signed by the Governor and Secretary of State and bearing the Seal of the Commonwealth of Kentucky, are filed with the record. The attack on the validity of these patents centers on the contention that the patent statutes as construed by the Court of Appeals of Kentucky apply only to uplands and do not permit the acquisition of the northern half of the bed of the Ohio River by patent proceedings.

"The question of whether or not the northern bed of the Ohio River is subject to patent was directly considered by the Court of Appeals of Kentucky in 1907 in the case of Ware v. Hager, 126 Ky. 324, [326] 103 S.W. 283. Chapter 136 of the Act of 1893 of the Kentucky Legislature, being Sections 4702–4705 of the Kentucky Statutes, Carroll's First Edition, 1903, was the law then in effect dealing with vacant and unappropriated land. The court construed this Act of 1893 as not authorizing the acquisition of the northern bed of the river by patent. In so holding the court said:

" 'While the state owns the land to the northern shore of the river, we do not think it has ever provided for the taking up of the river bed between the thread of the stream and the northern shore as vacant land. The proceeding in question was instituted under chapter 127, Ky.St.1903. Section 4702,

which is the first section of that chapter, provides that each county in the state shall have the right to dispose of the unappropriated lands lying therein not otherwise provided for in the manner thereinafter directed. Section 4703 provides that an actual settler on any vacant or unappropriated land shall have a pre-emption right to any number of acres, not exceeding 100. It also provides that any person who wishes to appropriate any vacant or unappropriated land may obtain an order of court authorizing him to enter and survey any number of acres, not more than 200. Section 4704 provides that the surveyor shall survey the entries in the order of time in which they are made, bounding the same by plainly marked trees, stones, or stakes, and noting where they bind on a water course or a marked line of another survey. In enacting these provisions, we cannot believe that the Legislature had in mind the taking up of the bed of the Ohio river between the thread of the stream and the northern shore. Such a survey could not be marked by stones or stakes or plainly marked trees. There could be no actual settlers on such land. While we do not doubt the power of the Legislature to provide for the issuing of patents for the bed of the Ohio river north of the thread of the stream, so that the sand or minerals which may be on or under this land may be appropriated, we do not think it has yet done so'.

"This opinion has not been overruled or modified, but in 1926 the patent statutes interpreted by it were amended. However, the 1926 Amendment did not disturb Sections 4703 and 4704 which were the basis of the court's decision. Section 4703 providing that an actual settler on vacant and unappropriated land shall have a pre-emption right to 100 acres and that any person may enter and survey up to 200 acres of vacant land was re-enacted. Section 4704 pro-

viding the survey shall be marked 'by plainly marked trees, stones or stakes, noting where it binds on a water-course, or the marked line of another survey, giving names', was also re-enacted. The re-enactment by a legis-lature of a statute interpreted by the highest court of the State constitutes an adoption of the statute as construed. Chatterson v. City of Louisville, 145 Ky. 485, 140 S.W. 647; Rose v. Turner, 301 Ky. 272, 191 S.W.2d 397; Button v. Hikes, 296 Ky. 163, 176 S.W.2d 112, 150 A.L.R. 779.

"The Patentees advance the further argument that Section I, Sec. 4702, of the 1926 Amendment repudiates the Ware case by declaring for the first time that the bed of the river north of the thread of the stream was 'vacant and unappropriated property', and that because of this declaration this prop-erty became subject to patent. * * * In Willis v. Boyd, 224 Ky. 732, 7 S.W. 2d 216 (1928), a case involving a sand and gravel lease of the north bed of the Ohio River, the 1926 Amendment was considered, and the court stated:

" 'Assuming the act to be valid, it will be observed that Section 4702 does not give the counties unlimited disposition of vacant lands. But such right is to be exercised "in a manner hereinafter directed," and while the mainland may be patented and sold in "the manner provided," therefor and made appli-cable thereto, the power of the disposi-tion of the river bed was restricted to the letting or leasing for county pur-poses upon such terms and conditions as to it may appear beneficial to said county.'

"Also see Board of Councilmen of City of Frankfort v. Pattie, 227 Ky. 343, 12 S.W.2d 1108.

"The Patentees also contend that ev-ery grant or patent of land is presumed to be valid and to have issued regularly

and is prima facie evidence of title. For their authority they rely on Wal-lace v. Maxwell, 24 Ky. 447, and Popu-lar Mountain Coal Co. v. Dick, 7 Ky. Op. 420. But a study of these cases discloses that the presumption that ex-ists is only that the officers charged with issuing a patent properly perform their duties. As stated in Wallace v. Maxwell (supra), 'It is admitted that the legal presumption is, that the sur-veyor, register, Governor and Secre-tary of State, have done their duty, in regard to the several Acts necessary to be performed by them, in granting lands; and therefore surveys and pat-ents should always be received as prima facie evidence of correctness, but fur-ther we cannot go.' The patents dis-close on their face that they cover part of the bed of the Ohio River, and it follows that the physical procedural steps required by the Statutes could not have been taken. The State cannot be bound by the unauthorized acts of its officers in issuing patents to land in dis-regard of the law declared in Ware v. Hager, supra. 'The Commonwealth is never bound by the act of any of its officers beyond the scope of their au-thority'. Allin v. County Board of Education, 148 Ky. 746, 147 S.W. 920, 922; United States Fidelity & Guar-anty Co. v. Commonwealth, 104 S.W. 1029, 31 Ky.Law Rep. 1179; Leslie County v. Keith, 227 Ky. 663, 13 S.W. 2d 1012; Juett v. Town of Williams-town, 248 Ky. 235, 58 S.W.2d 411.

"On the basis of the holding in Ware v. Hager which has not been overruled or modified and which has been given legislative sanction by the re-enactment of the sections of the law upon which the decision rests, and for the other reasons given herein, the patents in-volved in this action are invalid."

◼ The Legislature could not have con-templated the patenting of the river bed for the river bed had no value except for

the extraction of minerals or sand and gravel.

The development of the County Leasing Statute supports the Federal Court's opinion and the rule of Ware v. Hager. The statute originated in 1926 (Chapter 184, Acts of 1926) and was much more detailed than the present version (KRS 56.220) which is the product of the general statutory revision of 1942. The first section of the 1926 Act declared that "[e]ach county * * * shall have the right to dispose of the unappropriated lands lying therein * * *. And all that portion of the bed of the Ohio River, lying north of the thread of the stream, except such portions as may be accretions to islands privately owned, is hereby declared to be vacant and unappropriated property; and same may be held, leased and used for county purposes, as herein provided." After detailing the manner of patenting the vacant and unappropriated mainland within the counties, Section 2 of the Act authorized the "use, let or lease (of) said river bed for county purposes, upon such terms and conditions as to it (the county courts) may appear to be beneficial to said county" and then went on to validate "any contract of leasing that has been made, or that may hereafter be made" for sand and gravel rights, and validated the right and title of the lessee to the sand and gravel extracted.

In condensing the 1926 Act in the 1942 Revision, the probable explanation of the reference to the sand and gravel leases was removed from the statute when the words validating prior such leases were omitted, and, in addition, the aforequoted first sentence in the 1926 Act giving the counties "the right to dispose of the unappropriated lands lying therein" were omitted. The 1942 Revision also condensed the 1926 rather lengthy phraseology relative to the river bed into the brief reference to it in KRS 56.220 heretofore quoted in full. This background is pertinent to our discussion of the rights of the counties in the latter part of this opinion.

We cannot escape the conclusion that the 1926 General Assembly meant to fill the gap in our statutory law which was made apparent by Ware v. Hager, supra, by giving the counties the right to dispose of the unappropriated lands lying therein and declaring the Ohio River bed north of the thread of the stream to be vacant and "unappropriated land." In thus following the theory of Ware v. Hager, supra, the Legislature conceded the nonpatentability of the Ohio River bed north of the thread of the stream, and provided for its disposition by empowering the counties to use or lease it.

## II. The Commission

█ The Federal District Court and the Henderson Circuit Court reached opposite conclusions about the scope of the statutory authority of the Commission, the Federal Court concluding that the Commission alone had the authority to dispose of the land in the river bed. The Henderson Circuit Court subsequently concluded that the State Property & Building Commission Act was not intended to cover "vacant and unappropriated" lands which historically were disposed of by the county courts of the counties in which the lands lay. Unless the view of the Henderson Circuit Court is adopted, we must conclude that KRS 56.-220 (the statute authorizing the counties to use or lease the lands north of the thread of the stream of the Ohio River) has been repealed by implication and so have the general statutes governing the patenting of "vacant and unappropriated" land. It is axiomatic that repeal by implication is not favored.

The position of those claiming under the leases granted by the Commission is based upon the premise that the river bed north of the thread of the stream is owned by the State, has no public use to which it can be devoted by the State, and that, consequently, the Commission has the legal power to dispose of it.

██ Conceding that sovereign title to the land is in the State, it does not neces-

sarily follow that the Commission is the agency of the State which has the power to dispose of it. We concur in the succinct opinion of the trial court which said if it is held that the Commission has the power to dispose of "vacant and unappropriated" land in the counties and in the Ohio River bed:

"* * * then the Legislature has by inference repealed Section 56.190 of K.R.S. and this Court does not believe that the Legislature intended any such thing by the enactment of K.R.S. 56.440 to K.R.S. 56.550. If it had intended to repeal such an historic section of the law as this, it would have done so expressly.

"As pointed out by the County, the State Property and Buildings Commission would have jurisdiction over the vacant and unappropriated uplands, and vacant and unappropriated lands in all other river beds in Kentucky, and therefore would have the right to lease the bed of the Ohio River for the removal of sand and gravel and there is no claim by anyone that it has this power. It can readily be seen from the history of the State Property and Buildings Commission Act and from the opinion of the Court of Appeals that this law was enacted in order to have one central agency of the State Government to have control of all buildings necessary for State use and to insure proper and systematic planning of the building program. Governor Clements, in his address to the General Assembly, in urging re-enactment of the State Property and Buildings Commission Act to cure any possible defects in the title, said:

"'Kentucky has suffered by lack of continuity of planning in the construction of new buildings and it was and is the purpose of the Buildings Commission Bill to provide an agency which would supply the continuity of planning.'

"Certainly nothing is contained in this language to give even a hint that by the passage of this Act it was intended to repeal K.R.S. 56.220, and the Court of Appeals said, in construing the Building Commission Act, in Preston v. Clements, 313 Ky. 479, 232 S.W. 2d 85: 'Actually, there are involved only ministerial responsibilities, first, to ascertain the building and housing needs of the State and then make application of the Legislative mandate.' In considering the Legislative history of the two Acts, it can be seen that they are not in conflict and that K.R.S. 56.220 was not repealed by the enactment of the Buildings Commission Act, and this question must be answered in the negative."

### III. The Counties

 It is conceded that the counties' right to lease the river bed lands must stand or fall on KRS 56.220, heretofore quoted in full. The Federal District Court found although the first sentence in the County Leasing Statute (KRS 56.220) gave "a seemingly unrestricted grant of power to lease * * *," yet the second sentence gave rise to a serious doubt as to the general scope and meaning of the statute, and resolved its doubt by concluding that the county was limited to sand and gravel leases if it had any statutory authority at all. On the other hand, the Henderson Circuit Court decided that the reference to sand and gravel did not limit the plenary power to lease which the Federal Court conceded was granted by the first sentence. The enactment of the statute (KRS 56.220, now) in 1926 undoubtedly had its origin in the desire to clear up any doubts about the power of the counties to exercise dominion over the "vacant and unappropriated" land in the Ohio River bed north of the thread of the stream, doubts which naturally followed this Court's ruling in Ware v. Hager, supra, declaring that land unpatentable under the general patent statute because the inundated land could not

be suitably marked. The motivating cause in 1926 of the enactment of what is now KRS 56.220 was the uncertainty as to whether any unit of government had the legal power to execute leases or grant rights for the extraction of sand and gravel in that portion of the Ohio River bed, and hence the uncertainty as to whether any such leases theretofore executed were valid. The intention of the Legislature in its 1926 enactment (now KRS 56.220) is indicated by the title of the act itself (Ch. 184, Acts of 1926) which declared, "An Act to amend an Act entitled, 'An act concerning vacant and unappropriated lands,' approved February 2, 1893 * * *." It is obvious that by declaring the river bed land north of the thread of the stream to be "vacant and unappropriated" land and giving the counties control thereof and permitting them to keep the proceeds from the disposal thereof as allowed in the disposition of upland "vacant and unappropriated" land, the General Assembly was filling the gap in the general patenting statutes caused by this Court's ruling in Ware v. Hager, supra, and was completing the legal machinery for the disposition of the north portion of the Ohio River bed. In such circumstances, plenary power to use or dispose of that portion of the river bed undoubtedly was intended by the Legislature, the same degree of power of disposition as was permitted in the case of upland "vacant and unappropriated" land, except that the "vacant and unappropriated" land in the river bed could not be sold in fee simple because of its nature (Ware v. Hager), but could be used or leased "for county purposes, upon such terms and conditions as to it (the county court) seem beneficial to the county." The public purpose or policy behind all the statutes governing the disposition of "vacant and unappropriated" land is to encourage its development, War Fork Land Company v. Llewellyn (1923), 199 Ky. 607, 251 S.W. 663, and that being so, a narrow construction of KRS 56.220 which limits it to the granting of leases for the extraction of sand and gravel alone would militate against that policy. Our sketch of the history of the statute in Part I of this opinion (The Patentees) supports our conclusion that the General Assembly intended to give the counties the power over "all that portion of the Ohio River, lying north of the thread of the stream, except accretions to islands privately owned * * * [to] use or lease the river bed for county purposes * * *," as fully as it might otherwise deal with "vacant and unappropriated" land. The right to execute depletion leases is clearly implied in the circumstances. What else would be the purpose of leasing the river bed?

The judgment is affirmed.

MONTGOMERY and WILLIAMS, JJ., dissenting.

PALMORE, J., not sitting.