## OHIO *v.* KENTUCKY

No. 27, Orig.   Argued December 3, 1979—Decided January 21, 1980

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which WHITE and REHNQUIST, JJ., joined, *post,* p. 341.

*James M. Ringo,* Assistant Attorney General of Kentucky, argued the cause for defendant.   With him on the briefs were *Robert F. Stephens,* Attorney General, and *George F. Rabe.*

*Michael R. Szolosi* argued the cause for plaintiff.   With him on the brief were *William J. Brown,* Attorney General of Ohio, *Howard B. Abramoff,* Assistant Attorney General, and *Stephen C. Fitch.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The State of Ohio, in 1966, instituted this action, under the Court's original jurisdiction, against the Commonwealth of Kentucky.   By its bill of complaint as initially filed, Ohio asked that the Court declare and establish that the boundary line between the two States is "the low water mark on the

northerly side of the Ohio River in the year 1792." Leave to file the bill of complaint was granted. 384 U. S. 982 (1966). In due course, Kentucky filed its answer and a Special Master was appointed. 385 U. S. 803 (1966). In its answer, Kentucky alleged that the boundary line is the current low-water mark on the northerly side of the Ohio River.

Ohio later moved for leave to file an amended complaint that would assert, primarily, that the boundary between Ohio and Kentucky is the middle of the Ohio River, and, only alternatively, is the 1792 low-water mark on the northerly shore. That motion was referred to the Special Master. 404 U. S. 933 (1971). The Special Master held a hearing and in due course filed his report recommending that Ohio's petition for leave to amend be denied. 406 U. S. 915 (1972). Upon the filing of Ohio's exceptions and Kentucky's reply, the matter was set for hearing. 409 U. S. 974 (1972). After argument, the Special Master's recommendation was adopted, Ohio's motion for leave to amend was denied, and the case was remanded. 410 U. S. 641 (1973).

The Honorable Robert Van Pelt, who by then had been appointed Special Master following the resignation of his predecessor, thereafter filed his report on the case as shaped by the original pleadings. That report was received and ordered filed. 439 U. S. 1123 (1979). Kentucky lodged exceptions to the report, and Ohio filed its reply. Oral argument followed.

The Special Master recommends that this Court determine that the boundary between Ohio and Kentucky "is the low-water mark on the northerly side of the Ohio River as it existed in the year 1792"; that the boundary "is not the low-water mark on the northerly side of the Ohio River as it exists today"; and that such boundary, "as nearly as it can now be ascertained, be determined either a) by agreement of the parties, if reasonably possible, or b) by joint survey agreed upon by the parties," or, in the absence of such an agreement or

survey, after hearings conducted by the Special Master and the submission by him to this Court of proposed findings and conclusions. Report of Special Master 16.

We agree with the Special Master. Much of the history concerning Virginia's cession to the United States of lands "northwest of the river Ohio" was reviewed and set forth in the Court's opinion concerning Ohio's motion for leave to amend its 1966 complaint. 410 U. S., at 645–648. Upon the denial of Ohio's motion, the case was left in the posture that the boundary between the two States was the river's northerly low-water mark. The litigation, thus, presently centers on where that northerly low-water mark is—is it the mark of 1792 when Kentucky was admitted to the Union, ch. IV, 1 Stat. 189, or is it a still more northerly mark due to the later damming of the river and the consequent rise of its waters?

It should be clear that the Ohio River between Kentucky and Ohio, or, indeed, between Kentucky and Indiana, is not the usual river boundary between States. It is not like the Missouri River between Iowa and Nebraska, see, *e. g.,* *Nebraska* v. *Iowa,* 143 U. S. 359 (1892), or the Mississippi River between Arkansas and Mississippi. See *Mississippi* v. *Arkansas,* 415 U. S. 289 (1974), and 415 U. S. 302 (1974). See also *Iowa* v. *Illinois,* 147 U. S. 1 (1893); *Missouri* v. *Nebraska,* 196 U. S. 23 (1904); *Minnesota* v. *Wisconsin,* 252 U. S. 273 (1920); *New Jersey* v. *Delaware,* 291 U. S. 361 (1934); *Arkansas* v. *Tennessee,* 310 U. S. 563 (1940). In these customary situations the well-recognized and accepted rules of accretion and avulsion attendant upon a wandering river have full application.

A river boundary situation, however, depending upon historical factors, may well differ from that customary situation. See, for example, *Texas* v. *Louisiana,* 410 U. S. 702 (1973), where the Court was concerned with the Sabine River, Lake, and Pass. And in the Kentucky-Ohio and Kentucky-Indiana boundary situation, it is indeed different. Here the boundary

is not the Ohio River just as a boundary river, but is the northerly edge, with originally Virginia and later Kentucky entitled to the river's expanse. This is consistently borne out by, among other documents, the 1781 Resolution of Virginia's General Assembly for the cession to the United States ("the lands northwest of the river Ohio"), 10 W. Hening, Laws of Virginia 564 (1822); the Virginia Act of 1783 ("the territory . . . to the north-west of the river Ohio"), 11 W. Hening, Laws of Virginia 326, 327 (1823); and the deed from Virginia to the United States ("the territory . . . to the northwest of the river Ohio") accepted by the Continental Congress on March 1, 1784, 1 Laws of the United States 472, 474 (B. & D. ed. 1815). The Court acknowledged this through Mr. Chief Justice Marshall's familiar pronouncement with respect to the Ohio River in *Handly's Lessee* v. *Anthony,* 5 Wheat. 374, 379 (1820):

> "When a great river is the boundary between two nations or states, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream. But when, as in this case, one State is the original proprietor, and grants the territory on one side only, it retains the river within its own domain, and the newly-created State extends to the river only. The river, however, is its boundary."

The dissent concedes as much. *Post,* at 342. The dissent then, however, would be persuaded by whatever is "the current low-water mark on the northern shore." *Post,* at 343. But it is far too late in the day to equate the Ohio with the Missouri, with the Mississippi, or with any other boundary river that does not have the historical antecedents possessed by the Ohio, antecedents that fix the boundary not as the river itself, but as its northerly bank. *Handly's Lessee,* in our view, supports Ohio's position, not the dissent's. If there could be any doubt about this, it surely was dispelled completely when the Court decided *Indiana* v. *Kentucky,* 136 U. S. 479 (1890).

There Mr. Justice Field, speaking for a unanimous Court, said:

> "[Kentucky] succeeded to the ancient right and possession of Virginia, and they could not be affected by any subsequent change of the Ohio River, or by the fact that the channel in which that river once ran is now filled up from a variety of causes, natural and artificial, so that parties can pass on dry land from the tract in controversy to the State of Indiana. Its water might so depart from its ancient channel as to leave on the opposite side of the river entire counties of Kentucky, and the principle upon which her jurisdiction would then be determined is precisely that which must control in this case. *Missouri* v. *Kentucky,* 11 Wall. 395, 401. Her dominion and jurisdiction continue as they existed at the time she was admitted into the Union, unaffected by the action of the forces of nature upon the course of the river.
>
> .          .          .          .          .
>
> "Our conclusion is, that the waters of the Ohio River, when Kentucky became a State, flowed in a channel north of the tract known as Green River Island, and that the jurisdiction of Kentucky at that time extended, and ever since has extended, to what was then low-water mark on the north side of that channel, and the boundary between Kentucky and Indiana must run on that line, as nearly as it can now be ascertained, after the channel has been filled." *Id.,* at 508, 518–519.

The fact that *Indiana* v. *Kentucky* concerned a portion of the Ohio River in its Indiana-Kentucky segment, rather than a portion in its Ohio-Kentucky segment, is of no possible legal consequence; the applicable principles are the same, and the holding in *Indiana* v. *Kentucky* has pertinent application and is controlling precedent here. The Court's flat pronouncements in *Indiana* v. *Kentucky* are not to be rationalized away so readily as the dissent, *post,* at 343–345, would have

them cast aside. Kentucky's present contentions, and those of the dissent, were rejected by this Court 90 years ago.

We are not disturbed by the fact that boundary matters between Ohio and Kentucky by the Court's holding today will turn on the 1792 low-water mark of the river. Locating that line, of course, may be difficult, and utilization of a current, and changing, mark might well be more convenient. But knowledgeable surveyors, as the Special Master's report intimates, have the ability to perform this task. Like difficulties have not dissuaded the Court from concluding that locations specified many decades ago are proper and definitive boundaries. See, *e. g., Utah* v. *United States,* 420 U. S. 304 (1975), and 427 U. S. 461 (1976); *New Hampshire* v. *Maine,* 426 U. S. 363 (1976), and 434 U. S. 1 (1977). The dissent's concern about the possibility, surely extremely remote, that the comparatively stable Ohio River might "pass completely out of Kentucky's borders," *post,* at 343, is of little weight. Situations where land of one State comes to be on the "wrong" side of its boundary river are not uncommon. See *Wilson* v. *Omaha Indian Tribe,* 442 U. S. 653 (1979); *Owen Equipment & Erection Co.* v. *Kroger,* 437 U. S. 365, 369, n. 5 (1978); *Missouri* v. *Nebraska,* 196 U. S. 23 (1904).

Finally, it is of no little interest that Kentucky sources themselves, in recent years, have made reference to the 1792 low-water mark as the boundary. Informational Bulletin No. 93 (1972), issued by the Legislative Research Commission of the Kentucky General Assembly, states:

"Kentucky's North and West boundary, to-wit, the low water mark on the North shore of the Ohio River as of 1792, has been recognized as the boundary based upon the fact that Kentucky was created from what was then Virginia." *Id.,* at 3.

See also the opinion of the Attorney General of Kentucky, OAG 63–847, contained in Kentucky Attorney General Opinions 1960–1964. See also *Perks* v. *McCracken,* 169 Ky. 590,

184 S. W. 891 (1916), where the court stated that the question in the case was "where was the low water mark at the time Kentucky became a State."

The exceptions of the Commonwealth of Kentucky to the report of the Special Master are overruled. The report is hereby adopted, and the case is remanded to the Special Master so that with the cooperation of the parties he may prepare and submit to the Court an appropriate form of decree.

MR. JUSTICE POWELL, with whom MR. JUSTICE WHITE and MR. JUSTICE REHNQUIST join, dissenting.

The Court today holds that the present boundary between Ohio and Kentucky is the low-water mark of the northern shore of the Ohio River when Kentucky was admitted to the Union in 1792. This curious result frustrates the terms of the Virginia Cession of 1784 that first established the Ohio-Kentucky border, ignores Mr. Chief Justice Marshall's construction of that grant in *Handly's Lessee* v. *Anthony*, 5 Wheat. 374 (1820), is contrary to common-law rules of riparian boundaries, and creates a largely unidentifiable border. Accordingly, I dissent.

I

In 1784, the Commonwealth of Virginia ceded to the United States all of its territory "to the northwest of the river Ohio." 1 Laws of the United States 472, 474 ( B. & D. ed. 1815). As this Court recently observed, the border question " 'depends chiefly on the land law of Virginia, and on the cession made by that State to the United States.' " *Ohio* v. *Kentucky,* 410 U. S. 641, 645 (1973), quoting *Handly's Lessee* v. *Anthony, supra,* at 376. The 1784 Cession was construed definitively in *Handly's Lessee,* a case involving a dispute over land that was connected to Indiana when the Ohio River was low, but which was separated from Indiana when the water was high. The Court held that since the 1784 Cession required that the river remain within Kentucky, the proper

border was the low-water mark on the northern or northwestern shore. Consequently, the land in issue belonged to Indiana.

Mr. Chief Justice Marshall, writing for the Court, pointed out that Virginia originally held the land that became both Indiana and Kentucky. Under the terms of the Virginia Cession, he stated: "These States, then, are to have *the [Ohio] river itself, wherever that may be, for their boundary.*" 5 Wheat., at 379 (emphasis supplied). The Chief Justice found support for that conclusion in the original Cession:

"[W]hen, as in this case, one State [Virginia] is the original proprietor, and grants the territory on one side only, it retains the river within its own domain, and the newly-created State [Indiana] extends to the river only. The river, however, is its boundary." *Ibid.*

Such a riparian border, the Chief Justice emphasized, cannot be stationary over time. He wrote: "Any gradual accretion of land, then, on the Indiana side of the Ohio, would belong to Indiana. . . ." *Id.*, at 380. This rule avoids the "inconvenience" of having a strip of land belonging to one State between another State and the river.

"Wherever the river is a boundary between States, it is the main, the permanent river, which constitutes that boundary; and the mind will find itself embarrassed with insurmountable difficulty in attempting to draw any other line than the low water mark." *Id.*, at 380–381.

Because the boundary between Ohio and Kentucky was established by the same events that drew the line between Indiana and Kentucky, the holding in *Handly's Lessee* should control this case.[1] The Ohio River must remain the border between the States and within the domain of Kentucky. The

---

[1] Both parties to this litigation agree that the boundary between Kentucky and Ohio is controlled by the same legal and historical considerations that define the boundary between Indiana and Kentucky.

*only* way to ensure this result is to recognize the current low-water mark on the northern shore as the boundary.

The approach taken by the Court today defeats the express terms of the Virginia Cession and ignores the explicit language of Mr. Chief Justice Marshall in *Handly's Lessee*.[2] The Court's holding that the boundary forever remains where the low-water mark on the northern shore of the river was in 1792, regardless of the river's movements over time, may produce bizarre results. If erosion and accretion were to shift the river to the north of the 1792 low-water mark, today's ruling would place the river entirely within the State of Ohio. The river would thus pass completely out of Kentucky's borders despite the holding in *Handly's Lessee* that the Ohio "[R]iver itself, wherever that may be, [is the] boundary." *Id.,* at 379. The river would not be the boundary between the two States nor would Kentucky as successor to Virginia "retai[n] the river within its own domain" as Mr. Chief Justice Marshall declared that it must. *Ibid.* Similarly, if the river were to move to the south of the 1792 line, Ohio would be denied a shore on the river. Sensible people could not have intended such results, which not only would violate the plain language of the 1784 Cession, but also would mock the congressional resolution accepting Ohio into the Union as a State "bounded . . . on the South by the Ohio [R]iver." Ch. XL, 2 Stat. 173.

## II

The Court, like the Special Master, disregards the teaching of *Handly's Lessee*. Instead, the Court relies heavily on the

---

[2] Mr. Chief Justice Marshall, the author of *Handly's Lessee,* would seem a particularly reliable interpreter of the 1784 Cession. The Chief Justice was not only a practicing lawyer in Richmond in 1783 and 1784, but also served as a member of the General Assembly of Virginia that approved the Cession. 1 A. Beveridge, The Life of John Marshall 202–241 (1919).

decision in *Indiana* v. *Kentucky*, 136 U. S. 479 (1890), where Mr. Justice Field wrote that with respect to Kentucky's northern border, the State's "dominion and jurisdiction continue as they existed at the time she was admitted into the Union [1792], unaffected by the action of the forces of nature upon the course of the river." *Id.*, at 508; *ante*, at 339. Kentucky argues, with some force, that the Court in 1890 found no change from the 1792 boundary because that case concerned the abandonment of a channel by the river, the sort of avulsive change in course that ordinarily does not alter riparian boundaries. There is no sign of an avulsive change in the length of the Ohio River at issue in this case. Moreover, *Indiana* v. *Kentucky* went on to find that Indiana had acquiesced in Kentucky's prescription of the land at issue. There has been no showing before us that Kentucky has acquiesced to Ohio's claim that the 1792 low-water mark establishes the entire boundary between the two States. See n. 3, *infra*. Absent such a showing, I do not believe the holding in *Indiana* v. *Kentucky* should be applied here.

In any event, the force of Mr. Justice Field's opinion as a precedent may be questioned on its face. The decision cannot be reconciled with *Handly's Lessee* or with any normal or practical construction of Virginia's Cession in 1784. Indeed, the Court's opinion is essentially devoid of reasoning. After reproducing the passages in *Handly's Lessee* that establish that Kentucky must retain jurisdiction over the river, Mr. Justice Field states abruptly that, nevertheless, the boundary should be set at the low-water mark "when Kentucky became a State." 136 U. S., at 508. Mr. Justice Field apparently was unaware that, in effect, he was overruling the case on which he purported to rely. His conclusion is based simply on the startling view that when Kentucky "succeeded to the ancient right and possession of Virginia" in 1792, the new State received a boundary that "could not be affected by any subsequent change of the Ohio River."

*Ibid.* The opinion offers no further explanation for its holding.

Of course, Kentucky did succeed to Virginia's rights in 1792. After the Cession of 1784, Virginia was entitled to have the river within its jurisdiction and to have the northern low-water mark as the boundary between it and that part of the Northwest Territory that became Ohio and Indiana. Kentucky's entry into the Union could not, without more, replace those rights with the immutable boundary found by Mr. Justice Field. Neither Mr. Justice Field in 1890 nor the State of Ohio in this litigation pointed to any suggestion by Congress in 1792 that it intended such a result.

## III

Today's decision also contravenes the common law of riparian boundaries. In a dispute over the line between Arkansas and Tennessee along the Mississippi River, this Court noted:

> "[W]here running streams are the boundaries between States, the same rule applies as between private proprietors, namely, that when the bed and channel are changed by the natural and gradual processes known as erosion and accretion, the boundary follows the varying course of the stream." *Arkansas* v. *Tennessee,* 246 U. S. 158, 173 (1918).

See *Bonelli Cattle Co.* v. *Arizona,* 414 U. S. 313 (1973). This rule has an intensely practical basis, since it is exceedingly difficult to establish where a river flowed many years ago. Physical evidence of the river's path is almost certain to wash away over time, and documentary evidence either may not survive or may not be reliable.

The Court suggests that the Ohio-Kentucky boundary should not be determined by reference to previous river boundary decisions because the border in this case is not "the river itself, but . . . its northerly bank." *Ante,* at 338. This

contention contradicts Mr. Chief Justice Marshall's statement, quoted by the Court, that with respect to Kentucky's northern border, " '[t]he river, however, is its boundary.' " *Ibid.* In addition, the Court does not explain why established principles of riparian law are inapplicable simply because the northern low-water mark, not the center of the river, is the boundary. Since both lines shift over time, it is only sensible to adopt the common-law view that borders defined by those lines will move with them.[3]

## IV

Following today's decision, all boundary matters between Ohio and Kentucky will turn on the location almost 200 years

---

[3] The Court seeks support for today's decision from a recent statement by the Legislative Research Committee of the Kentucky General Assembly and a 1963 opinion of the Kentucky Attorney General. *Ante,* at 340. Although both documents refer to the 1792 low-water mark as the proper boundary, they are hardly authoritative pronouncements that should control our outcome. Indeed, other legislative and judicial statements refer to the northern low-water mark without any mention of the 1792 line. See 57 Stat. 248 (interstate Compact between Indiana and Kentucky defining the boundary as the "low-water mark of the right side of the Ohio River"); *Commonwealth* v. *Henderson County,* 371 S. W. 2d 27, 29 (Ky. App. 1963) (Kentucky's boundary is "north or northwest low watermark of the Ohio River"); *Louisville Sand & Gravel Co.* v. *Ralston,* 266 S. W. 2d 119, 121 (Ky. App. 1954) (" 'our state boundary is along the north bank of the Ohio river at low-water mark,' " quoting *Willis* v. *Boyd,* 224 Ky. 732, 735, 7 S. W. 2d 216, 218 (1928)).

Under the doctrine of prescription and acquiescence, it may be proved that one party has recognized through its actions a riparian boundary claimed by another party. See *Michigan* v. *Wisconsin,* 270 U. S. 295, 308 (1926). That question, however, is one of fact. The Special Master did not request evidence from the parties on this issue, so it is not properly before us now. We cannot decide such a question on the basis of particular shards of evidence that may come to our attention. In view of the conflicting evidence on the claim of prescription and acquiescence, the correct course would be to return this litigation to the Special Master for findings of fact on that question.

ago of the northern low-water mark of the Ohio River. This cumbersome and uncertain outcome might be justified if it were dictated by unambiguous language in the Virginia Cession. But since the Court's decision is not only unworkable but also does violence to that deed as it has been construed by this Court, I cannot agree with its ruling today.