REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 40

September Term, 2013

POTOMAC SHORES, INC.

v.

RIVER RIDERS, INC., ET AL.

Eyler, Deborah S.,
Kehoe,
Rubin, Ronald B.
        (Specially Assigned)

JJ.

Opinion by Kehoe, J.

Filed: August 29, 2014

Maryland and Virginia have wrangled for centuries over two rivers, the Potomac and the Pocomoke, that constitute most of their shared boundary. In 1877, an arbitration award, accepted by both states and ratified by the Congress, established the boundary as the low-water mark on the Virginia side of the Potomac River for those parts of the State and the Commonwealth located west of the Chesapeake Bay.[1] But the shores of the Potomac, like those of all rivers, change as a result of accretion, erosion, and reliction.[2] Does the boundary between Maryland and Virginia shift as the south bank of the Potomac alters because of time and the forces of nature? Or is the boundary fixed and immutable? If the latter, fixed and immutable as of what date? The award provided no explicit guidance.

The present appeal requires us to provide an answer, at least for part of the river. In the absence of a definitive ruling from the Supreme Court, we conclude that, as to the non-tidal portion of the river,[3] our boundary with Virginia shifts as time and the gradual forces of nature alter the location of the Potomac River's southerly shore. For that reason, we will

---

[1] We will discuss the arbitration award, which is commonly referred to as the Black-Jenkins Award, in greater detail in Part II(3).

[2] "Accretion" is "[t]he gradual accumulation of land by natural forces[.]" BLACK'S LAW DICTIONARY 22 (8th ed. 2004). "Erosion" is "[t]he wearing away of something by action of the elements; exp., the gradual eating away of soil by the operation of currents or tides." *Id*. at 582. We will also reference two other terms. The first is "reliction," which is "[a] process by which a river or stream shifts its location, causing the recession of water from its bank." *Id*. at 1317. The second is an "avulsion," which consists of "[a] sudden removal of land caused by change in a river's course or by flood." *Id*. at 147.

[3] The Potomac is tidal from its mouth to a point in the District of Columbia just downstream of the Little Falls of the Potomac. Raymond W. Schaffranek, *A Flow-Simulation Model of the Tidal Potomac River*, published in A WATER-QUALITY STUDY OF THE TIDAL POTOMAC RIVER AND ESTUARY (U.S. Geological Survey Water-Supply Paper 2234) (1987).

affirm the judgment of the Circuit Court for Washington County that dismissed, for want of subject matter jurisdiction, Potomac Shores Inc.'s trespass action against River & Trail Outfitters, Inc., and River Riders, Inc.

## Background

River & Trail and River Riders are outdoor adventure outfits which operate fishing, tubing, and whitewater rafting tours on the upper Potomac River. Potomac Shores alleges that employees and customers of appellees routinely cross over a narrow strip of land, no more than 150 feet wide, located along the southerly bank of the upper Potomac River (about a mile downstream from Harper's Ferry, West Virginia), in an area known locally as Potomac (or Potoma) Wayside. Potomac Shores claims ownership of the land in question because an 1873 deed in its chain of title describes the boundary of its property as being the dividing line between Maryland and Virginia "bounding the south shore of the Potomac River at medium water mark." Potomac Shores contends that what was the medium water mark in 1873 now lies on the landward side of the south bank because of gradual accretion to the shoreline. For these reasons, it views appellees' use of the south bank as a trespass on its property.

Appellees moved to dismiss the complaint. They contended that the circuit court lacked jurisdiction over the alleged trespass because the south bank at Potomac Wayside is located in Virginia, and not Maryland. They also asserted that the land in question is owned by the National Park Service (as part of the Harper's Ferry National Historic Park), and that they have permission from the Park Service to use the site for access to the river.

2

After a hearing, the circuit court, the Honorable M. Kenneth Long, presiding, granted the motion by means of a thorough and well-reasoned memorandum opinion. After examining the long and complicated history of boundary-related disputes between those who neighbor on the Potomac, Judge Long determined that "the boundary between Maryland and Virginia follows the low-water mark on the south side of the Potomac River as the banks of the river shift over time" and, based on this determination, concluded that the south bank at Potomac Wayside was "outside the jurisdiction of the [courts of the] State of Maryland." Judge Long dismissed the case for lack of jurisdiction without addressing the merits of the parties' remaining contentions. Potomac Shores's motion for reconsideration was denied. This appeal followed.

After oral argument, and in light of the significant issue raised by the appeal, we invited the Attorneys General of Maryland and Virginia to file *amici curiae* briefs. In a jointly filed brief, the Attorneys General agree with the circuit court that the real property that is the subject of this litigation is located in Virginia. We will affirm the judgment of the circuit court.

## Analysis

The motion to dismiss filed in this case included matters outside the four corners of the complaint and its exhibits. We will therefore treat the motion as one for summary judgment. *See D'Aoust v. Diamond*, 424 Md. 549, 573 (2012); Md. Rule 2-322(c). We review *de novo* a circuit court's grant of summary judgment based solely on a matter of law.

3

*Harford County v. Saks Fifth Ave. Distrib. Co.*, 399 Md. 73, 82 (2007); Md. Rule 2-501.

At the heart of Potomac Shores's trespass claim is its contention that it owns the strip of land lying between Potomac Wayside and the river—an assertion that appellees dispute. If the parcel in question is in Virginia, the circuit court is without jurisdiction to resolve the question of ownership. *See Wilmer v. Philadelphia & Reading Coal & Iron Co.*, 130 Md. 666, 678 (1917) (Maryland courts do not have jurisdiction to resolve disputes as to title of land located in another state.).

## I. Overview and the Parties' Contentions

We provide a brief overview in order to place the parties' contentions in context.

### A.

The boundaries of forty-four of the forty-eight contiguous states are formed, at least in part, by rivers.[4] The United States Supreme Court has original jurisdiction over disputes between states arising out of these boundaries.[5] *See* U.S. Const., Article III, § 2 ("In all cases . . . in which a state shall be party, the Supreme Court shall have original jurisdiction."); *Virginia v. Maryland*, 540 U.S. 56, 60 (2003). In the exercise of that jurisdiction, the Supreme Court has generally recognized two types of riparian boundaries.

---

[4]The exceptions are Montana, Wyoming, Utah and Colorado.

[5]But inferior courts, including those of Maryland, may exercise jurisdiction over disputes between private parties that call for a determination of the precise location of a boundary between two states. This is a function of a court's inherent authority to determine the scope of its own jurisdiction. However, pursuant to Article III, § 2, such determinations are not binding on the states.

4

The first category consists of state boundaries that are defined as being in the center, or at the center of the channel, of a river. *See, e.g., Louisiana v. Mississippi*, 516 U.S. 22, 24-25 (1995); *Louisiana v. Mississippi*, 466 U.S. 96, 99 (1984); *Arkansas v. Tennessee*, 397 U.S. 88, 89-90 (1970); *Arkansas v. Tennessee*, 246 U.S. 158, 173-75 (1918). Such boundaries typically shift with *gradual* changes in the river or its channel resulting from accretion or erosion, but are not altered by a sudden change—an avulsion—in the river's geography. *Arkansas v. Tennessee*, 397 U.S. at 89-90.

The second type of boundary follows the contours of one of the river's shorelines, usually at the low-water mark. *See, e.g., Illinois v. Kentucky*, 500 U.S. 380 (1991)*; Ohio v. Kentucky*, 444 U.S. 335 (1980)*; Maryland v. West Virginia*, 217 U.S. 577 (1910); *Morris v. United States*, 174 U.S. 196 (1899); *Indiana v. Kentucky*, 136 U.S. 479 (1890). Whether a shoreline boundary shifts with accretion or erosion, or remains fixed in time, largely depends on the historical reasons for the particular boundary. For example, in a series of cases involving boundary disputes along the Ohio River between Kentucky, on one hand, and Indiana, Ohio, and Illinois, on the other, the Supreme Court emphasized that its decisions as to the precise location of the Ohio River boundary were heavily influenced by historical factors unique to the formation of that boundary. *See, e.g., Ohio v. Kentucky*, 444 U.S. at 337–38 ("[I]t is far too late in the day to equate the Ohio with the Missouri, with the Mississippi, or with any other boundary river that does not have the historical antecedents possessed by the Ohio. . . ."). Specifically, Indiana, Ohio, and Illinois were formed out of

5

territory ceded by Virginia to the United States in 1784, and in that cessation Virginia retained jurisdiction over the Ohio River to its northerly shore. Kentucky succeeded to Virginia's rights to the Ohio when Kentucky was admitted to the Union in 1792. *Id*. at 337-38. Based on this history, the Court has held that Kentucky's northerly boundary was coterminous with the river's northerly shore as of 1792, and that the boundary has not since changed as a result of accretion, erosion or reliction. *See, e.g., Illinois v. Kentucky*, 500 U.S. at 383–84; *Ohio v. Kentucky*, 444 U.S. at 338; *Indiana v. Kentucky*, 136 U.S. at 508.

Courts and legal commentators have sometimes referred to river boundaries that shift with accretion or erosion as following a "shifting boundary theory." Conversely, river boundaries that remain fixed as of a particular historical date are said to reflect a "fixed boundary theory." The terms originate, in part, from the pre-eminent scholarly treatise on this subject, 2 Aaron L. Shalowitz and Michael W. Reed, SHORE AND SEA BOUNDARIES 501-04 (1964) ("Shalowitz and Reed").[6] We will use this terminology in this opinion.

## B.

In support of its argument that Potomac Wayside lies within Maryland, Potomac Shores argues that the "fixed boundary" principle applied in the Ohio River cases also applies to the Potomac River boundary. In other words, it contends that the boundary between Maryland and Virginia was fixed at some point in the past. According to Potomac Shores, subsequent changes in the configuration of the south shore of the river do not affect

---

[6]All references to Shalowitz and Reed are to the second volume of that work.

the location of the boundary. Potomac Shores offers several possibilities as to when precisely the boundary became fixed and asserts that, regardless of which one we ultimately select, the land in question in this lawsuit is located in Maryland.

The circuit court, the Attorneys General, and the appellees are in unison that Potomac Shores draws the wrong lesson from the Ohio River cases. The appellees and the Attorneys General assert, and the circuit court concluded, that the Supreme Court's reasoning in those cases was based, not upon a rule generally applicable to all interstate riparian boundaries, but instead on the unique historical circumstances surrounding the formation of the states bordering the Ohio River. We agree.

Like the Ohio, the Potomac River has its own history. For our purposes, the relevant history includes: conflicting colonial-era land grants; the terms of the 1877 Black-Jenkins Award; a cartographic survey of part of the boundary that was accepted by both states as reflecting the terms of the award; and two interstate compacts between Maryland and Virginia whereby the states resolved disputes over access to the use and enjoyment of the river and its resources. This history, and the Supreme Court cases interpreting it, form the substance of our analysis.

## II. The History

### (1) The Conflicting Grants of the Colonial Period

When it came to granting title to land in what is now the eastern United States, the members of England's Stuart dynasty were generous but not overly consistent. An exegesis

7

of the numerous grants made by the Stuart monarchs that, at least arguably, encompassed the Potomac River is beyond the scope of this opinion.[7] It is sufficient for our purposes to note that, by the end of the seventeenth century, there were at least three conflicting jurisdictional claims to the Potomac River: (1) those of the Virginia colonial assembly, as the successor-in-interest to the London Company, which had received several grants from King James I to induce the company to establish the colony at Jamestown; (2) those of the lords proprietary of Maryland, pursuant to the 1632 grant by Charles I to Cecilius Calvert, Lord Baltimore, Maryland's first Lord Proprietor; and (3) those of Thomas, Lord Fairfax, deriving from a 1688 grant by James II to Fairfax's father-in-law, Thomas Culpeper. No serious attempt was made to resolve these claims until the American Revolution.

*(2) The Compact of 1785: Maryland and Virginia Settle*
*Some Disputes but Fail to Agree on a Boundary*

In 1776, against the backdrop of the revolutionary tide rising across the colonies, delegates from Virginia met in Williamsburg and proposed what was eventually adopted as Virginia's first constitution. In it, Virginia ceded to Maryland the territories included in Charles I's 1632 Charter to Lord Baltimore:

> except the free navigation and use of the rivers Patomaque and Pokomoke, with the property of the Virginia shores and strands, bordering on either of the said rivers, and all improvements, which have been, or shall be made thereon. The western and northern extent of Virginia shall, in all other respects, stand as fixed by the Charter of King James I in the year one thousand six hundred

---

[7]For additional information as to these conflicting grants, see Report of the Special Master in *Virginia v. Maryland*, 540 U.S. 56 (2003), available at http://www.supremecourt.gov/specmastrpt/orig129_120602.pdf (last visited July 22, 2014).

and nine, and [other enumerated authorities].

Va. Const. Art. XXI (1776), *reprinted in* 1 Hening's Stat. 50, 56 (1823).

The Commonwealth's olive branch was spurned. Delegates from Maryland, meeting in Annapolis, responded by adopting a resolution declaring "that the state of Virginia hath not any right or title to any of the territory, bays, rivers, or waters, included in the charter granted by [Charles I] to [Lord] Baltimore" and that "sole and exclusive jurisdiction over the territory, bays, rivers, and waters, included in the said charter, belongs to this state." Proceedings of the Conventions of the Province of Maryland (Oct. 30, 1776), *reprinted in* 78 Md. Archives 292-93 (1836).

As the War of Independence wound down, both Maryland and Virginia passed acts of confiscation which effectively ended the proprietorships of the successors to Lord Baltimore and Lord Fairfax and cemented each state's jurisdictional authority over its colonial territory.[8] Disputes between the two states escalated, especially as to the right of navigation on the river. In an effort to resolve these disagreements, George Washington, at the time a private citizen, invited the legislatures of both Maryland and Virginia to appoint commissioners to negotiate on behalf of their respective states. The commissioners met at

---

[8]The acts of confiscation, passed by Maryland in 1781 and Virginia in 1783, resulted in voluminous litigation. *See, e.g., Martin v. Waddell*, 41 U.S. 367 (1842); *Martin v. Hunter's Lessee*, 14 U.S. 304 (1816); *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603 (1812).

Mount Vernon in March, 1785.[9]

These efforts resulted in the Compact of 1785, an agreement by which the states resolved many of their differences as to navigation upon, and access to, the river, but failed to reconcile their differing views as to their proper boundary line.[10] Article Seventh of the Compact is relevant to the dispute before us because it expressly reserved to "[t]he citizens of each state respectively" riparian rights:

> in the shores of the Patowmack river adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharfs and other improvements . . . .

The Compact became binding upon its approval, confirmation, and ratification by the legislatures of Maryland and Virginia. 1785 Md. Laws ch. 1; 1786 Va. Acts ch. 17.[11]

---

[9]The commissioners included: from Virginia, George Mason and Alexander Henderson; and from Maryland, Samuel Chase, Thomas Stone, and Daniel of St. Thomas Jenifer. *See* 1785–1786 Md. Laws ch. 1 (preamble).

[10]*See Virginia v. Maryland*, 540 U.S. at 68 ("While the 1785 Compact resolved certain jurisdictional issues, it did not determine the boundary between the States."); *Marine Ry. & Coal Co. v. U.S.*, 257 U.S. 47, 63-64 (1921) (the 1785 Compact "says nothing about the boundary . . . it left the question of boundary open to long continued disputes"); *see also Wharton v. Wise*, 153 U.S. 155, 173–77 (1894) (summarizing the circumstances leading up to the Compact, as well as its substantive terms); *Barnes v. State*, 186 Md. 287, 292-96 (1946) (same).

[11]The relationship of Maryland and Virginia was not always acrimonious. For example, both states passed legislation forming the Potomac Company, a venture tasked with improving the navigability of the non-tidal portion of the Potomac River (above the fall line). 1784 Md. Laws ch. 33; 1784 Va. Acts ch. 43. The Company constructed canals and other improvements on both sides of the Potomac, but was never financially successful. Eventually, its assets were transferred to the Chesapeake and Ohio Canal Company. *See Chesapeake & O. Canal Co. v. Baltimore & O.R. Co.*, 4 G. & J. 1, 73 (1832).

*(3) The Black-Jenkins Award of 1877: The Boundary Is Conceptually Defined But Not Physically Located*

Throughout the early to mid-nineteenth century, the legislatures of both Maryland and Virginia passed an array of sometimes conflicting laws concerning the Potomac and the Pocomoke Rivers and the Chesapeake Bay. Officials of both states made sporadic, but unsuccessful, attempts to resolve the on-going boundary questions. The resulting jurisdictional uncertainty contributed in no small part to violent disputes among watermen—from Maryland, from Virginia, and from New York and New England—over the right to engage in the highly profitable business of harvesting what at the time appeared to be an inexhaustible resource—the Chesapeake Bay oyster.[12]

In 1874, in the face of escalating violence on the Chesapeake Bay and its estuarine tributaries, Maryland and Virginia agreed to submit their conflicting boundary claims to arbitration. The arbitrators—Jeremiah Black, James Beck, and Charles Jenkins—released their decision in 1877 in what is commonly known as the "Black-Jenkins Award."[13]

In reaching their decision, the arbitrators recognized that the colonial royal grants were irreconcilably in conflict. Using Charles I's 1632 charter as "the original measure of

---

[12] Endemic violence between watermen and law enforcement officials of Maryland and Virginia over oyster harvesting—commonly referred to as the "Oyster Wars"—continued for decades. *See, e.g., Wharton v. Wise*, 153 U.S. 155, 174 (1894); *Ex parte Marsh*, 57 F. 719 (1893); John R. Wennersten, THE OYSTER WARS OF CHESAPEAKE BAY (1981) ("Wennersten").

[13] The full text of the Award and the arbitrators' opinion (but not its accompanying map) are found as Exhibits C and D to the Report of the Special Master in *Virginia v. Maryland*, 540 U.S. 56 (2003).

11

[the] territory" of Maryland, they determined that the boundary had, at one point, run along "the right bank [the south bank] of the Potomac, where the high-water mark is impressed upon it" but that "this is not the present boundary." Instead, in the arbitrators' view, Virginia's prescriptive use of the river's south bank had changed the boundary to the south bank's low-water mark for the course of the entire river:

> The evidence is sufficient to show that Virginia, from the earliest period of her history, used the South Bank of the Potomac as if the soil to the low water-mark had been her own . . . .We . . . cannot help being influenced by our conviction . . . that [the Compact of 1785] applies to the whole course of the river above the Great Falls as well as below.[14]

* * * *

> [I]t established that Virginia has a proprietary right on the south shore to low water-mark, and appurtenant thereto, has a privilege to erect any structures connected with the shore which may be necessary to the full enjoyment of her riparian ownership, and which shall not impede the free navigation or other common use of the river as a public highway.

Based upon these and other considerations, the arbitrators concluded that the boundary line between Maryland and Virginia was, in relevant part, as follows (emphasis added):

> Beginning at the point on the Potomac River where the line between Virginia and West Virginia strikes the said river at low-water mark, and *thence,*

---

[14]A decision by Maryland's Chancellor held that the 1785 Compact applied only to the tidal portions of the Potomac River. *Binney's Case,* 2 Bland 99, 126 (1829). Even after the issuance of the Black-Jenkins Award, the Court of Appeals concluded that the scope of the 1785 Compact did not extend past Great Falls. *Middlekauff v. Le Compte*, 149 Md. 621, 628 (1926). These holdings are inconsistent with the opinion of the arbitrators, and cannot be squared with the Supreme Court's subsequent decision in *Maryland v. West Virginia*, discussed *infra*. For a further discussion of these early Maryland cases, see *Barnes*, 186 Md. at 298–304. Virginia's courts appear to have interpreted the 1785 Compact as applying to the entire river. *See Hendricks v. Commonwealth*, 75 Va. 934, 939-40 (1882).

*following the meanderings of said river, by the low-water mark,*[15] to Smith's Point, at or near the mouth of the Potomac....

\* \* \* \*

The low-water mark on the Potomac, to which Virginia has a right in the soil, is to be measured . . . from low-water mark at one headland to low-water mark at another, without following indentations, bays, creeks, inlets, or affluent rivers.

\* \* \* \*

Virginia is entitled not only to full dominion over the soil to low-water mark on the south shore of the Potomac, but has a right to such use of the river beyond the line of low-water mark as may be necessary to the full enjoyment of her riparian ownership . . . .

In contrast to the laconic description of the boundary along the Potomac, the Award set out longitudinal and latitudinal coordinates as to the location of the boundary in the Chesapeake Bay and portions of the Eastern Shore. The Award also included a map delineating the boundary along a portion of the lower Potomac River. The Award did not, however, include any further description of the boundary along the portion of the Potomac River located above Alexandria, Virginia.[16]

The Black-Jenkins Award was approved, confirmed, and ratified by the legislatures of both Maryland and Virginia, and was approved by Congress pursuant to the Compact

---

[15]"[T]he 'low-water mark' of a river is defined as 'the point to which the water recedes at its lowest stage.'"*Virginia v. Maryland*, 540 U.S. at 62 n.2 (quoting Black's Law Dictionary 1586 (7th ed. 1999)).

[16]The discrepancy in treatment reflected disputes between the states over oyster beds in Pocomoke and Tangier Sounds in the Chesapeake Bay. *See* Wennersten, at 46–68.

Clause of the Constitution, Art. I § 10, cl. 3. 1878 Md. Laws ch. 374; 1878 Va. Acts ch. 246;

Act of March 3, 1879, ch. 196, 20 Stat. 481.[17]

*(4) The Whiting Decision of 1889: The United States Coast and Geodetic Survey Articulates Rules for Interpreting the Text and Map of the Black-Jenkins Award*

Despite the mutual acceptance of the Black-Jenkins Award, disagreements between Maryland and Virginia as to the actual location of the boundary persisted. One involved the location of the boundary in the vicinity of "Hog Island," in Judith Sound and the Coan River on the lower Potomac River.[18] The states referred the matter to Henry Whiting, an official of the United States Coast and Geodetic Survey, for resolution. The details of the dispute are not germane to the issues before us. What is important for our purposes is that Whiting articulated principles for interpreting the Black-Jenkins Award that were later adopted by Maryland and Virginia. One was that (emphasis added):

> [T]he descriptive text used [in the Award] and the conventional sign[19] adopted can only be regarded as *an intentional avoidance of more specific mention and definition of points and features which time and natural causes might so change* as to render their future identification doubtful. Whereas, the right bank of the Potomac, in its general features, will always be the right bank

---

[17]Although the 1785 Compact pre-dates the existence of Congress, "when Congress approved the Black-Jenkins Award [in 1879] it implicitly consented to the 1785 Compact as well." *Virginia v. Maryland*, 540 U.S. at 63 n.3.

[18]The "Hog Island" in question no longer exists. The area in question is located near the present-day village of Lewisetta, Virginia.

[19]"Conventional signs" is a term for uniform topographical and surveying symbols used on plats and maps. *See* Shalowitz and Reed, at 556. The "conventional sign" to which Whiting referred was the arbitrators' depiction of the boundary on the map accompanying the Award.

so long as the river itself remains.[20]

*(5) The Mathews and Nelson Survey of the Boundary
along the Tidal Portions of the River*

Although various entities, including the Coast and Geodetic Survey, prepared maps of the boundary between Maryland and Virginia based on the Black-Jenkins Award, no map was mutually acceptable to the two states. In addition, there was lingering uncertainty as to the precise boundaries of some of the "indentations, bays, creeks, inlets, or affluent rivers" of the Potomac that the arbitrators awarded to Virginia. In the 1920's, the State and the Commonwealth sought to rectify this situation by instructing Maryland State Geologist Edward Mathews and Virginia State Geologist Wilbur Nelson to conduct an official survey of the river "in accordance with" the Award. Mathews and Nelson did so in 1927. The result of their efforts is found at Edward B. Mathews and Wilbur A. Nelson, REPORT ON THE LOCATION OF THE BOUNDARY LINE ALONG THE POTOMAC RIVER BETWEEN VIRGINIA AND MARYLAND IN ACCORDANCE WITH THE AWARD OF 1877 (1928) (the "1928 Report"). Mathews and Nelson "based their work . . . on the principles laid down by Mr. Whiting whose decision regarding the boundary line at Hog Island was apparently accepted by both Virginia and Maryland in 1889." 1928 Report, at 13.

One of the "principles laid down by Mr. Whiting" was that the language of the Award

---

[20]The full text of Whiting's decision is found at Edward B. Mathews and Wilbur A. Nelson, REPORT ON THE LOCATION OF THE BOUNDARY LINE ALONG THE POTOMAC RIVER BETWEEN VIRGINIA AND MARYLAND IN ACCORDANCE WITH THE AWARD OF 1877 at 11, 39-42 (1928); *see also* Shalowitz and Reed at 498-99 (discussing Whiting's decision and reasoning).

"can only be regarded as an intentional avoidance of more specific mention and definition of points and features which time and natural causes might so change as to render their future identification doubtful." Mathews and Nelson concluded that the boundary between the states (emphasis added):

> follow[s] in a general way the course of the south bank of the river *as shown by its general figure and the erosion of its banks by its waters* without taking into consideration the minor sinuosities due to the entrance of streams or the flooding of low areas due to an erosion of the shore below low-water mark to such tributaries.

1928 Report, at 11-13, 15-16. Of course, the boundary is the low-water mark on the south bank, not the south bank itself. Mathews and Nelson did not attempt to locate the low-water mark at any point along the river's south bank. Shalowitz and Reed, at 503.

The Mathews-Nelson Survey resulted in the production of several maps of the south shore of the Potomac from Jones Point, near Alexandria, Virginia, to Smith's Point, at the confluence of the river and the Chesapeake Bay. The maps, which are appended to the 1928 Report, do not purport to show the low-water line of the river. The maps were subsequently approved and ratified by the legislatures of both Maryland and Virginia as a "just and fair expression of the Award of 1877" and the "true representation" of the boundary between the states. 1929 Md. Laws ch. 109; 1928 Va. Acts ch. 1232.

In 1929, pursuant to recommendations made by Mathews and Nelson, geologic engineers placed fifty-eight "monuments"—stone markers with "Virginia-Maryland Boundary Commission" inscribed on them—along the banks of the Potomac River beginning

16

at Jones Point, in Alexandria, Virginia, and extending to the river's mouth. Shalowitz and Reed, at 500–03.[21] The monuments were intended to allow surveyors to locate the approximate boundary between the states as of 1929, but did not purport to establish, nor do they provide a mechanism to determine, the low-water mark at any of the marked locations or anywhere in-between. *Id.* at 502–03. Mathews and Nelson did not survey any part of the Potomac River located above Jones Point.

### (6) The Potomac River Compact of 1958: The States Re-Affirm the Award and the Survey

Neither the Black-Jenkins Award nor the Mathews-Nelson Survey put an end to interstate disputes over the Potomac. In the 1940's and 1950's, Maryland and Virginia again began to wrangle over the river, again prompted in part by continued violence between the watermen and law enforcement officials of both states over the river's oyster beds and other natural resources. The states eventually settled their disputes by entering into the Potomac River Compact of 1958. *See* 1958 Md. Laws ch. 269, 1959 Va. Acts ch. 28, Pub. L. No. 87-783, 76 Stat. 797 (1962).

Although, in formulating the terms of the 1958 Compact, Maryland and Virginia focused primarily on resolving the fisheries-related disputes at the heart of the ongoing lawlessness and violence on the river, two aspects of the compact are important to our

---

[21] Mathews and Nelson prepared a supplemental report regarding the monumentation process which, confusingly, is identical in title (other than the date of publication) but not in content, to the 1928 Report. *See* REPORT ON THE LOCATION OF THE BOUNDARY LINE ALONG THE POTOMAC RIVER BETWEEN VIRGINIA AND MARYLAND IN ACCORDANCE WITH THE AWARD OF 1877 (1930).

17

analysis. First, the compact's preamble provides, in pertinent part (emphasis added):

> Maryland and Virginia each recognizing that *Maryland is the owner of the Potomac River bed and waters to the low water mark of the southern shore thereof, as laid out on the Mathews-Nelson Survey of 1927*, and that Virginia is the owner of the Potomac River bed and waters southerly from said low water mark, as laid out, and the *citizens of Virginia have certain riparian rights along the southern shore of the River as shown on said Mathews-Nelson Survey....*

Second, Article VII, § 1 reaffirms Article Seventh of the 1785 Compact:

> The rights, including the privilege of erecting and maintaining wharves and other improvements, of the citizens of each State along the shores of the Potomac River adjoining their lands shall be neither diminished, restricted, enlarged, increased nor otherwise altered by this Compact, and the decisions of the courts construing that portion of Article VII of the Compact of 1785 relating to the rights of riparian owners shall be given full force and effect.

The 1958 Compact remains a valid and binding agreement between Maryland and Virginia. *See Virginia v. Maryland*, 540 U.S. at 64 n.4.

### *(7) The Potomac River Cases*

Three United States Supreme Court cases involving jurisdictional disputes on the Potomac River are also important to our analysis: *Morris v. United States*, 174 U.S. 196 (1899); *Maryland v. West Virginia*, 217 U.S. 1 (1910), and *Maryland v. West Virginia*, 217 U.S. 577 (1910); and *Virginia v. Maryland*, 540 U.S. 56 (2003).

*Morris* was decided subsequent to the Black-Jenkins Award but prior to the Mathews-Nelson Survey. The case involved the claims of various riparian property owners to artificially filled areas along the northerly and southerly banks of the Potomac within the jurisdiction of Washington, D.C. The plaintiffs, tracing their claims to either Charles I's

18

1632 charter to Lord Baltimore or to James II's 1688 charter to Lord Culpeper, asserted that they owned the filled areas because they owned the riverbed atop which the fill had been placed. 174 U.S. at 223-24, 227-28.

In rejecting these claims, the Court relied on two observations important to our analysis: First, that "the grant to Lord Baltimore in unmistakable terms included the Potomac river. . . .," *id.* at 223, and that "Lord Baltimore, his heirs and assigns, were never divested [of the river] by any valid proceedings prior to the Revolution, nor was such grant affected by the subsequent grant to Lord Culpeper." *Id.* at 225. And, second, that Maryland and Virginia, by enacting legislation confirming the Black-Jenkins Award, had declared "the jurisdictional line and boundary [between them] . . . to be the low-water mark on the Virginia shore." *Id.* at 224. The Court did not, however, address whether the boundary along the south bank's low-water mark was fixed as of a certain date, or whether the boundary line fluctuated with accretion or erosion of the bank.

In 1910, the Supreme Court decided *Maryland v. West Virginia*. The decision, which was issued in two parts, resolved a jurisdictional dispute on the upper Potomac River between Maryland and West Virginia, as successor to Virginia's claims to that portion of the river. 217 U.S. at 22-23. Among the issues presented was a jurisdictional claim by West Virginia "to the Potomac river to the north bank thereof. . . ." *Id.* at 45. The Court rejected this claim by expressly relying on the *Morris* Court's observation that the 1632 Charter had granted to Maryland "'the Potomac river and the soil under it, and the islands therein, to the

19

high-water mark on the southern or Virginia shore. . . .'" *Id.* at 46 (quoting *Morris*, 174 U.S. at 224-25). The Court ordered the parties to submit a decree settling their jurisdictional rights to the territories in dispute in accordance with the aforesaid holdings.

The states, however, could not agree on several things, including whether the shared boundary line along the Potomac's south shore was located at the high-water or low-water marks. 217 U.S. at 578. To resolve the issue, the Court looked to the Compact of 1785, and concluded that "the privileges reserved [in the Compact] respectively to the citizens of the two states on the shores of the Potomac are inconsistent with the claim that the Maryland boundary on the south side of the Potomac river shall extend to the high-water mark"; and that "[t]here is no evidence that Maryland has claimed any right to make grants on that side of the river, and the privileges reserved to the citizens of the respective states in the compact of 1785, and its subsequent ratifications, indicate the intention of each state to maintain riparian rights and privileges to its citizens on their own side of the river." *Id*. at 580-81. Based on these observations, the Court concluded that, "[t]he decree will therefore provide for the south bank of the Potomac river at low-water mark on the West Virginia shore as the true southern boundary line of the state of Maryland." *Id*. at 581. In so holding, the Court noted that, "[t]his conclusion gives to Maryland a uniform southern boundary along Virginia and West Virginia, at low-water mark on the south bank of the Potomac river," and that it "is also consistent with the previous exercise of political jurisdiction by the states respectively." *Id*. at 581. As in *Morris,* the Court did not expressly address whether the

20

boundary between the states on the southern bank of the Potomac River at the low-water mark was fixed as of a particular date, or whether the boundary line shifted with accretion or erosion of the south bank.

*Virginia v. Maryland,* the most recent Supreme Court case on the jurisdiction issue, arose out of a dispute between Maryland and Virginia over Maryland's attempt to regulate Virginia's "right to withdraw water from the Potomac River and to construct improvements appurtenant to the Virginia shore." 540 U.S. at 60. Several aspects of the Court's analysis are important for our purposes. First, the Court noted that "*Morris* did ultimately decide that Maryland's 1632 charter included the Potomac River from shore to shore" and that "the Black-Jenkins arbitrators held that Maryland was sovereign over the River to the low-water mark on the Virginia shore." *Id*. at 68-69. Second, in determining that Virginia held sovereign rights "to use the River beyond the low-water mark," the Court noted—approvingly—that the states were in agreement that the territory landward of the low-water mark on the river's south bank was in Virginia, and not Maryland. *Id*. at 69, 72. As in its prior decisions, the Court omitted any discussion about whether the south bank's low-water mark was to be determined on a shifting basis, or as of the date of the Black-Jenkins Award of 1877, the Mathews-Nelson Survey of 1927, or some other historical date.

We now turn to the contentions raised by Potomac Shores.

### III. The South Bank at Potomac Wayside

Potomac Shores asserts that the boundary between Maryland and Virginia was fixed

according to the south bank's low-water mark as it existed in 1877 (the date the Black-Jenkins Award was issued), 1927 (the date the Mathews-Nelson Survey was conducted), or 1929 (the date the boundary monuments were erected along the lower river).[22] Resolving this claim requires us to interpret the Compacts of 1785 and 1958, the Black-Jenkins Award, and the Mathews-Nelson Survey. Because these authorities were approved by the legislatures of Maryland and Virginia and, in some instances, by Congress, we construe them pursuant to the general rules of statutory construction. *See Virginia v. Maryland*, 540 U.S. at 66; *New Jersey v. New York*, 523 U.S. 767, 811 (1998); *Barnes v. State*, 186 Md. at 291-92. In interpreting these authorities, our goal is to discern the drafter's intent. *Breslin v. Powell*, 421 Md. 266, 286 (2011); *Barnes*, 186 Md. at 291. We look to the plain language of the text, giving it its natural and ordinary meaning, *State Dep't of Assessments & Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 13 (1997), and read it in the context in which it appears. *Breslin*, 421 Md. at 287.

We begin with the Black-Jenkins Award. The Award established that the boundary between Maryland and Virginia on the upper Potomac River was to run along the river's south bank at low-water mark "following the meanderings of said river, by the low-water mark, to [the mouth of the river]." The Award also established that Virginia "is entitled to

---

[22]Potomac Shores does not assert that either 1878 (when the Black-Jenkins Award was adopted by the legislatures of Maryland and Virginia) or 1879 (when the Award was approved by Congress) are operative dates. If it had, we would, for the same reasons as discussed in the main text, disagree that the low-water mark along the upper river's south bank was fixed as of those dates.

full dominion over the soil to low-water mark." Conspicuously absent from the Award or its accompanying opinion, however, is any attempt by the arbitrators to identify or further define the south bank's low-water mark along the upper Potomac as it existed in 1877. Although a map of a portion of the lower river near the Chesapeake Bay was incorporated into the Award, that map does not depict Potomac Wayside nor does it identify the south bank's low-water mark.[23]

Additionally instructive is the Award's interpretation by the U.S. Coast and Geodetic Survey official Henry Whiting, who based his survey of Hog Island in part on the principle that "the descriptive text" used in the Award "can only be regarded as an intentional avoidance of more specific mention and definition of points and features which time and natural causes might so change as to render their future identification in doubt." 1928 Report, at 11 (quoting U.S.C. & G.S. Report for 1890). In consistent fashion, neither *Morris* nor *Maryland v. West Virginia*, both of which were decided subsequent to the Black-Jenkins Award but prior to the Mathews-Nelson Survey, interpreted the Award as establishing a fixed, unwavering boundary as of 1877. *See also* Shalowitz and Reed, at 502 ("Up to the time of marking the boundary line in 1929, the technical evidence seems clear that a shifting boundary theory was followed."). All of this convinces us that the Black-Jenkins Award did not permanently fix the boundary as the south bank's 1877 low-water mark.

We next decide whether the Mathews-Nelson Survey fixed the low-water mark on the

---

[23]The map accompanying the Award is reproduced in Shalowitz and Reed, at 176.

south bank at Potomac Wayside. We believe that it did not. In their reports, Mathews and Nelson made several things very clear. First, the survey was conducted for the purpose of "determin[ing] where the accepted boundary lies . . . in accordance with the Award of 1877"—as opposed to setting a new boundary. Second, the survey "made no changes in the actual boundary" and did not otherwise "afford[] an opportunity for a review or introduction of the old controversies regarding [rights to the river]." Finally, the survey was made "on the principles laid down by Mr. Whiting," including, presumably, Whiting's conclusion that the Award was intended to establish a shifting, as opposed to a fixed, boundary. 1928 Report, at 1-2, 11; 1930 Report, at 1.

To accomplish their task, Mathews and Nelson surveyed the river's south bank up to Alexandria, Virginia, creating official cartographic maps in the process. Consistent with the purposes of the survey and the principles previously espoused by Whiting, Mathews and Nelson did not attempt to locate the low-water mark along the south bank. Moreover, the legislatures approved the cartographic maps produced during the survey as a "just and fair expression of the Award of 1877," and not as a new or independent delineation of the boundary between Maryland and Virginia. 1929 Md. Laws ch. 109; 1928 Va. Acts ch. 1232. Thus, there can be no question that the Mathews-Nelson Survey did not fix, nor even attempt to locate, the low-water mark at any location along the river, much less those parts of the river that Mathews and Nelson did not survey.

We come to the same conclusion with respect to the boundary commission's

24

monuments. The monuments track the Mathews-Nelson Survey, and, as such, were not placed upriver of Jones Point. While the approximate boundary line at the location of the monuments can be determined using appropriate surveying techniques, the monuments were all placed above the high-water mark, and "no tidal control was used for determining the low-water line" at any of the marked locations or anywhere in-between. Shalowitz and Reed, at 500, 502-03.

There is a more fundamental problem with this aspect of Potomac Shores' argument. Even if we assume that the monuments were intended to fix the location of the boundary as of the date of the survey, the fact remains that the upper river was neither surveyed nor monumented. It would be illogical for us to conclude that a survey of one portion of the river was intended to fix the boundary in other areas.

All of this leads us to conclude that the Black-Jenkins Award established a shifting boundary. Whether the joint legislative approval of the Mathews-Nelson Survey changed the nature of the boundary on the *tidal* portions of the river is not before us because Mathews and Nelson never purported to survey the *non-tidal* portion of the Potomac. Accordingly, we hold that the boundary of Maryland and Virginia along the upper river's south bank, including Potomac Wayside, follows the low-water mark as it presently exists, shifting with gradual changes in the shoreline due to accretion and erosion. Our conclusion is not affected by the 1958 Compact, because its reference to the interstate boundary is limited to the stretch of the river surveyed by Matthews and Nelson. We need not—and do

not—address whether the boundary on the tidal portions of the river is shifting or fixed.

This interpretation is consistent with the Supreme Court's observations in *Maryland v. West Virginia* and other cases, and ensures the protection of Virginia's riparian rights and rights over the soil to the low-water mark as recognized in the Compacts of 1785 and 1958, the Black-Jenkins Award, and by the Supreme Court. As the Attorneys General point out, this view is also in accord with the historical exercise of each state's jurisdictional rights, including their exercise of criminal jurisdiction. *See, e.g., Barnes*, 186 Md. at 309 (observing that county jurisdiction extends to "the ultimate limits of [Maryland] across the Potomac River, which would be to low-water mark on the Virginia shore."); *Traverso v. Commonwealth*, 6 Va. App. 172, 174 (1988) (citing Va. Code 7.1-7) ("[T]he boundary between Virginia and Maryland . . . runs with the Potomac River's low water mark as it 'meanders' along the Virginia shoreline."). As a matter of policy, the adoption of a shifting boundary theory constitutes a fair and practical way to avoid jurisdictional uncertainties along the upper Potomac, at least at the present time.

Moreover, this approach is in accord with the rules governing disputes between private property owners over title to accreted or eroded land, rules which are instructive in deciding boundary disputes between states. *See Virginia v. Maryland*, 540 U.S. at 82-83 (Kennedy, J., dissenting) (quoting *Rhode Island v. Massachusetts*, 37 U.S. 657, 714 (1838) ("No court acts differently in deciding on boundary between states, than on lines between separate tracts of land.")); *Arkansas v. Tennessee*, 246 U.S. 158, 173 (1918) ("[W]here

26

running streams are the boundaries between States, the same rule applies as between private proprietors."). The rule applicable to individuals who own property bordering on bodies of water was succinctly stated by the Court in *Arkansas v. Tennessee*: "when the bed and channel are changed by the natural and gradual processes known as erosion and accretion, the boundary follows the varying course of the stream." 246 U.S. at 173; *see also Steelman v. Field*, 142 Va. 383, 389 (1925) ("However this line may thus change either for the advantage or disadvantage of the riparian owner, low water mark remains his true boundary . . . . that which is lost at one place is sometimes gained at another."); Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 262 (1766) (U. Chicago Press 1979) ("[I]f a river, running between two lordships, by degrees gains upon the one, and thereby leaves the other dry; the owner who loses his ground thus imperceptibly has no remedy . . . .").

We harbor no doubt that it is within the means of capable surveyors to accurately identify the low-water mark as it presently exists at Potomac Wayside. We do not need a precise delineation of the low-water line to resolve the jurisdictional question in this case, however. In its complaint, Potomac Shores alleges that appellees trespassed on property located landward of the river. In its appellant brief, Potomac Shores clarifies that it "does not in any way challenge the right of any person to use the waters of the Potomac River[.]" In other words, Potomac Shores's position is that appellees were trespassing only on property located landward of the south bank's low-water mark. Because this territory lies in Virginia, and not Maryland, we will affirm the decision of the circuit court dismissing this case for

27

lack of jurisdiction.[24]

## IV. The "Rock Outcroppings"

In the course of the circuit court's hearing on appellees' motions to dismiss, Potomac Shores argued for the first time that appellees also trespassed on the riverbed's "rock outcroppings"—what are, in essence, large rocks that peak above the water's surface at various points. The circuit court did not address this claim in its opinion. Highlighting the omission, Potomac Shores moved for reconsideration, arguing that, even if the south bank at Potomac Wayside was in Virginia, the "rock outcroppings" were located in Maryland. The

---

[24]Potomac Shores also asserts that, to the extent that the Virginia shoreline at Potomac Wayside has changed through accretion, most, or perhaps all, of that accretion was the result of human activity, specifically, the construction of a nearby bridge abutment. Potomac Shores points to a series of California decisions, *e.g. City of Los Angeles v. Anderson*, 206 Cal. 662, 668 (1929) and *City of Newport Beach v. Fager*, 39 Cal. App. 2d 23, 26 (1940), in support of its contention that "[i]f the accretion was formed by artificial means or is caused by the upland owner, then in such cases title to the newly formed land will remain with the owner of the riverbed." There are difficulties with this argument. These cases are concerned with private ownership, not the location of interstate boundaries. Additionally, the lands in question in the cases were created not by accretion but by artificial means, specifically, harbor improvement projects. *Anderson*, 206 Cal. at 663; *Fager*, 39 Cal. App. 2d 23, 26-27. Thus, these cases are factually inapposite.

Moreover, as the Attorneys General point out, the federal common law of accretion controls state boundary questions. *See Virginia v. Maryland*, 540 U.S. at 74 n.9 ("Federal common law governs interstate bodies of water, ensuring that . . . neither State harms the other's interest in the river."). The federal cases do not differentiate between accretion resulting from human activities and accretion caused by natural events. *See, e.g., California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 281-85 (1982) (Under the "federal rule . . . accretions, regardless of cause, accrue to the upland owner. . . ."). Thus, as long as the change in the shoreline at Potomac Wayside was accretive, that is, gradual—and this is not in dispute—the immediate cause of the accretion is not relevant for purposes of locating the boundary.

circuit court denied the motion, observing that Potomac Shores' complaint lacked any mention of rock outcroppings or allegations of trespass thereon, and, further, that, in its pleadings, Potomac Shores had asserted that the alleged trespass was "limited to the land it owns adjacent to the Potomac River."

Potomac Shores argues that the court erred in dismissing this claim because the alleged trespass occurred in Maryland. Potomac Shores misconstrues the basis of the circuit court's ruling. The court did not dismiss the rock outcroppings claim on jurisdictional grounds. Rather, it concluded that, because the claim was not alleged at all, much less properly, in the operative complaint, it did not save the complaint from dismissal. The circuit court was correct. *See* Md. Rule 2-303 (setting forth Maryland's pleading requirements); *cf. Tavakoli-Nouri v. State*, 139 Md. App. 716, 732 (2001) ("The failure to state separate causes of action in separate counts is improper and renders the complaint deficient.").[25]

## Conclusion

We hold that the boundary between Maryland and Virginia at Potomac Wayside is the low-water mark on the Virginia shore as the shore changes location over time through the forces of accretion, erosion and reliction. Our reasoning is applicable to other boundary questions on the non-tidal portions of the Potomac River. In reaching our decision, it is not necessary for us to decide whether the same analysis would apply to the boundary along the

---

[25] Potomac Shores also argues that the circuit court abused its discretion in failing to grant it leave to amend the complaint in order to add its claim of trespass over the rock outcroppings. Potomac Shores did not, however, move for leave to amend, and it offers no reasons as to why the court was obligated to grant such relief *sua sponte*.

tidal portions of the river.[26]

**THE JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY IS AFFIRMED. APPELLANT TO PAY COSTS.**

---

[26] There is one difference between our analysis and the circuit court's. In its memorandum opinion, the circuit court noted that "even if the [Mathews-Nelson] Survey fixed the boundary, it could only have fixed the boundary that it represented on the maps it submitted with its report." The circuit court nonetheless concluded that "the boundary between Maryland and Virginia follows the low water mark on the south side of the Potomac River as the banks of the river shift over time." In other words, the court did not distinguish between the tidal and non-tidal portions of the Potomac. As we have explained, we are limiting our holding to the non-tidal portions of the river.